AMERICAN MEDICAL ASSOCIATION
et al., Plaintiffs,

Pharmaceutical Manufacturers
Association,
Plaintiff-Intervenor,

v.

F. David MATHEWS, Secretary of
Health, Education and Welfare,
Defendant,

Commonwealth of Massachusetts and
State of Connecticut,
Defendants-Intervenors.

No. 75 C 2512.

United States District Court,
N. D. Illinois, E. D.

March 7, 1977.

Newton N. Minow, Jack R. Bierig, Sidley & Austin, Bernard D. Hirsh, B. J. Anderson, Chicago, Ill., for plaintiffs.

Jenner & Block, Joan M. Hall, Chicago, Ill., for plaintiff-intervenor.

Earl J. Silbert, U. S. Atty., Washington, D. C., Samuel K. Skinner, U. S. Atty., Frederick H. Branding, Asst. U. S. Atty., Chicago, Ill., Jeffrey B. Springer, Deputy Chief Counsel for Regulations and Hearings, Michael P. Peskoe, Associate Chief Counsel for Enforcement Food and Drug Administration Department of Health, Education and Welfare, Rockville, Md., Eugene R. Sullivan, Atty., Civ. Div., Dept. of Justice, Washington, D. C., for defendant.

### OPINION

MARSHALL, District Judge.

This action challenges the validity of the Maximum Allowable Cost (MAC) regulations of the Department of Health, Education and Welfare (HEW) which establish a mechanism for limiting reimbursement or payment for multiple-source prescription drugs under federally subsidized health care programs (mainly Medicare and Medicaid). The case raises important issues concerning the authority of the defendant, Secretary of HEW, to control spiraling expenditures in federal health programs in the face of claims by the medical profession, selected patients and the drug industry that the Secretary's efforts violate a host of legislative enactments, procedural requirements and the Constitution. We have concluded, for the reasons hereinafter stated, that all of the objections are without merit. Accordingly, judgment will enter dismissing the action.

Plaintiffs are the American Medical Association (AMA), five licensed physicians who are AMA members and who treat patients who receive Medicare and Medicaid benefits, four recipients of Medicare benefits and two Medicaid recipients. The Pharmaceutical Manufacturers Association (PMA) has intervened as a plaintiff.

Defendant is the Secretary of HEW. The Commonwealth of Massachusetts and the State of Connecticut intervened as defendants.

The complaint and intervening complaint allege violations of the Social Security Act, the Public Health Service Act, the Administrative Procedure Act and the Fifth Amendment to the Constitution.[1] Jurisdiction is here under 28 U.S.C. § 1331.

The case is ready for decision on a series of motions and countermotions which will be described shortly. But first we summarize the history and content of the challenged MAC regulations.

### I. AN OVERVIEW OF THE MAC REGULATIONS

On November 15, 1974 the Secretary published proposed regulations to establish a procedure for limiting reimbursement or payment for multiple-source drugs under the Medicare and Medicaid programs (42 U.S.C. § 1395 *et seq.* and 42 U.S.C. § 1396 *et seq.*, respectively) and certain other federal-

---

1. Plaintiffs contend that the regulations are arbitrary and capricious and therefore violate the Fifth Amendment. Although our inquiry is phrased in terms of the regulations' reasonableness, we are cognizant of the underlying constitutional allegations.

ly sponsored health programs. 39 Fed.Reg. 40302. After reviewing more than 2,600 public comments on the proposal, the Secretary published the final MAC regulations on July 31, 1975. They became effective on August 26, 1976. 40 Fed.Reg. 32284 (45 C.F.R. § 19.1 *et seq.*). The regulations undertake to reduce the cost of prescription drugs paid for by the Medicare and Medicaid programs and they provide a comprehensive scheme for the determination, application and review of cost limitations.

MAC determinations are made by a Pharmaceutical Reimbursement Board, which consists of five full-time HEW employees representing the principal program areas involved in developing and implementing cost determinations. The Board begins the MAC determination process by identifying "multiple-source drugs" for which significant amounts of federal funds are being expended and for which formulators or labelers charge significantly different prices. A "multiple-source drug" is a "drug marketed or sold by two or more formulators or labelers or a drug marketed or sold by the same formulator or labeler under two or more different proprietary names or both under a proprietary name and without such a name." 45 C.F.R. § 19.2(d). For example, the antibiotic ampicillin trihydrate is sold under a variety of trademarked brand names, including Amcill and Totacillin. 1975 *Physicians' Desk Reference* at 302. After the Board identifies a multiple-source drug, it must seek advice from the Food and Drug Administration (FDA) concerning whether present FDA regulatory control will assure the marketability and bioequivalence[2] of the proposed MAC drug. Unless the FDA advises the Board that the estab-

lishment of a MAC should be delayed or withheld, the Board proceeds to determine the "lowest unit price" at which the multiple-source drug is "widely and consistently available" on a national and, when appropriate, a local basis. The Board is required to submit this determination, together with supporting information, to the Pharmaceutical Reimbursement Advisory Committee. The Committee is composed of nine members who are not full-time employees of the federal government and who represent the areas of pharmacy, pharmacology, medicine, pharmaceutical marketing, public health, and consumer affairs. The function of the Committee is to advise the Board on the appropriateness of all proposed MAC determinations, and, upon request, to advise the Board and the Secretary on matters relating to general HEW policies and procedures involving drug reimbursement. After considering the Committee's advice and recommendations, the Board decides whether to propose the lowest unit price as the maximum allowable cost (MAC) for the drug. If it decides to do so, the proposed MAC is published in the Federal Register, thereby triggering provisions in the regulations which afford an opportunity for the public to respond by submitting written comments or by requesting an informal public hearing. The Board may, but need not, grant such a hearing. On the basis of the evidence and submissions, accumulated by these procedures, the Board then makes its final MAC determination and publishes notice of its decision.

Once a MAC is established, reimbursement benefits for that drug under Medicare and Medicaid may not exceed the *lowest* of three possible computations: (1) the MAC of the drug plus a reasonable dispensing fee; (2) the acquisition cost[3] of the drug

**2.** Drug products are said to be chemically equivalent when they contain the same amount of the same *active* ingredient in the same dosage form. Drug products are said to be bioequivalent [or equally bioavailable] when their active ingredients are absorbed from the gastrointestinal tract at substantially the same rate and to the same extent as indicated by the time-course of their concentration in the blood. They are said to be therapeutic equivalents when they produce the same therapeutic effect with no difference in toxicity or side-effects.

*Hearings Before the Subcommittee on Monopoly of the Select Committee on Small Business of the U.S. Senate*, 94th Cong., 1st Sess., pt. 26, p. 11656 (1975).

**3.** Acquisition cost is defined as the price generally and currently paid by providers for a drug marketed or sold by a particular formulator or labeler in the package size of the drug most frequently purchased by providers. *Id.* § 19.-2(f).

plus a reasonable dispensing fee; or (3) the provider's[4] usual and customary charge to the public for the drug. *Id.* § 19.3(a). However, the MAC limit is not applicable to a brand of the drug "which the prescriber has certified in his own handwriting is medically necessary for that patient." *Id.* § 19.3(a)(3)(i). Because of this alternative cost limitation scheme, non-multiple-source drugs, which are not covered by MACs, will nonetheless be subject to cost controls (2) or (3) as will specially prescribed "medically necessary" drugs. However, the focus of the plaintiffs' complaint is on the MAC limitations.

The regulations provide for the Board to regularly review the MAC list to assure that continued application of each MAC is justified. Moreover, any individual may make a written request that a MAC determination be revised or withdrawn. If the Board determines that substantial grounds for review exist, it is required to initiate the

**4.** A provider is one who furnishes medical or pharmaceutical services or supplies for which he is entitled to reimbursement or payment under an eligible health program. *Id.* § 19.2(e).

**5.** Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . . or to exercise any supervision or control over the administration or operation of any . . . institution, agency or person [providing health services]. 42 U.S.C. § 1395.

**6.** The issues the AMA withheld include whether the regulations:
 1. Provide adequate standards to govern the PRB's determinations of which medications are medically "equivalent";
 2. Ignore the scientific and administrative impossibility of ensuring that similar medications produced by different manufacturers, with different ingredients, and under different conditions are therapeutically equivalent;
 3. Will adversely affect the quality of care received by patients participating in federal health programs;
 4. Will restrain competition among drug manufacturers and will have other serious economic impact;
 5. Provide adequate procedural safeguards for interested parties.
 AMA brief, p. 3.

same procedures as those by which the MAC was initially established.

## II. THE PROCEDURAL HISTORY OF THE CASE

The procedural history of this case is complex. The parties have filed a plethora of motions which have spawned numerous and lengthy briefs and exhibits. The Secretary answered the complaint of the six plaintiff recipients but moved to dismiss the five plaintiff physicians and the American Medical Association for lack of standing. Simultaneously, the AMA sought judgment on the pleadings on two of its claims: (1) that the MAC regulations contravene the reimbursement standards of the Social Security Act; and (2) that the regulations amount to federal supervision and control over the practice of medicine in violation of 42 U.S.C. § 1395.[5] The AMA plaintiffs withheld from their motion several disputed procedural questions for resolution at trial. These questions concern whether the promulgation of the regulations was arbitrary, capricious and an abuse of discretion.[6] The

Four of the reserved AMA issues are disposed of in our discussion of the related issues raised by PMA. AMA's reserved issues (1) through (3) are subsumed by PMA's issues (1) and (2) as described on p. 1188 of this memorandum. Those issues are resolved *infra* at 1205–1211. See also our discussion *infra* at 1197–1201. AMA's reserved issue (5) is encompassed by our discussion of PMA's issue (3), which is resolved *infra* at 1210–1214. Remaining is AMA's issue (4), which alleges that the regulations will restrain competition and have other serious economic effects. Phrased in procedural terms, the AMA contends that the Secretary's conclusion that the regulations would have a positive economic effect is not supported by the record.

The standard of review for this question is outlined in detail *infra* at 1204–1205. In brief, the Secretary need not demonstrate through the citation of substantial evidence that each individual criticism of the regulations is without merit. *Automotive Parts & Accessories v. Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968). If the record shows that major policy issues were considered and resolved, then the agency's decision is reasonable.

The record here shows the Secretary's careful attention to the foreseeable economic impact of the MAC regulations. The 41-page Inflation Impact Statement incorporated into the Preamble at ¶ 11, indicates an overall savings to the federal and state governments of about $37 million a year, with no appreciable infla-

Secretary then moved for partial summary judgment on the same issues on which the AMA had previously sought judgment on the pleadings.

Subsequently, plaintiff-intervenor PMA, an association representing 131 member drug manufacturers and distributors, filed its complaint which reiterated many of the AMA's claims and which also raised new allegations of procedural infirmities in the MAC regulations. PMA then moved for summary judgment raising issues which, unlike the AMA's statutory issues, are primarily factual and procedural. PMA contends in its motion that the MAC regulations (1) violate the Social Security Act and are arbitrary and capricious because the record provides no basis for the Secretary's finding that the regulations will not impair the quality of care to Medicare and Medicaid beneficiaries, (2) are unlawful because the record provides no basis for the finding that the costs to be saved by the regulations are unnecessary in the efficient delivery of needed health services, (3) unlawfully allocate to the Food and Drug Administration authority to make determinations as to drug quality and therapeutic equivalence without adequate procedural safeguards, and (4) violate Executive Order No. 11821 which requires inflationary impact statements.

Then the intervenor state defendants moved for judgment on the pleadings with respect to the two legal issues previously raised in the AMA motion, i. e., contravention of the reimbursement standards of the Social Security Act and alleged federal supervision and control over the practice of medicine. The Secretary then made his second cross-motion for partial summary judgment, this time on the four issues raised in the PMA motion. A third cross-motion for partial summary judgment by the Secretary is also pending and seeks to dispose of the remaining issues raised in the complaints.

In light of (or, perhaps, despite) this tortured history, we have concluded that all of the material disputed issues have been moved upon and abundantly briefed and the case is ready for final decision on the merits. We discuss the issues in the following order: (1) plaintiffs' standing, (2) statutory validity of the reimbursement standards, (3) supervision and control over the practice of medicine, (4) the basis for the Secretary's findings (including drug quality and unnecessary costs), (5) the fairness of the MAC procedures, and (6) compliance with Executive Order No. 11821.

### III. PLAINTIFF PHYSICIANS' AND AMA'S STANDING

Before reaching the merits of the various motions, we must evaluate the standing of the AMA and the plaintiff physicians which is challenged by the Secretary's motion to dismiss. The Supreme Court has held that the Administrative Procedure Act [7] confers standing upon those who can show that the challenged agency action has caused them "injury in fact" and that the alleged injury is to an interest "arguably within the zone of interests to be protected or regulated" by the statutes that the agency is claimed to have violated. *United States v. SCRAP,*

---

tionary effect. This estimate is based upon a department study, the scope and methods of which are described in the Statement. Some of the factors considered were drug prices, the cost of administering the regulations, the impact of the manufacturers' loss of revenue on drug research and development, and the loss of tax revenues. Although the predicted savings is necessarily only an estimate, the Secretary's conclusion that the MAC program is economically feasible is reasonably supported by the record. See Statement; Preamble ¶¶ 9–14.

The Statement and the Preamble also reflect the Secretary's concern with the regulations' probable impact upon competition in the drug industry. The Secretary rebutted the contention that the regulations would fix or authorize the fixing of drug prices, or otherwise interfere with the free enterprise system. Preamble ¶¶ 25–26. In addition, the Secretary concluded that the MAC regulations would enhance competition in some respects. Statement at 8–9. In light of this record, we reject the AMA's contention that the Secretary arbitrarily disregarded the competitive impact of the MAC regulations.

7. In the first paragraph of their complaint, plaintiffs allege that the action arises in part under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). The Secretary challenges the standing of the American Medical Association and five of its member physicians solely on the ground that the allegations in the complaint are insufficient to demonstrate that these six plaintiffs will suffer any injury, economic or otherwise, as a result of the promulgation of the MAC regulations. The dispute centers on paragraph 14 of the complaint, which alleges that the MAC regulations, by limiting federal reimbursement to the cost of the least expensive multiple-source drug, effectively compel physicians to prescribe these drugs, even though they would otherwise prescribe another drug which they believe to be safer, more reliable, or more effective. This compulsion also stems from the allegation that hospitals and pharmacists will not furnish non-MAC drugs to patients, because to do so would require these providers to subsidize the added unreimbursable cost of non-MAC drugs.[8] The AMA also alleges that the MAC regulations thereby violate 42 U.S.C. § 1395, which prohibits federal supervision or control over the practice of medicine. In his motion the Secretary contends that any alleged interference or injury to a physician's prescribing practices is illusory, because the MAC limitation on reimbursement is inapplicable whenever the physician certifies in his own handwriting that a particular drug product is medically necessary for his patient. With the physician's freedom thus preserved and a statutory violation avoided, the Secretary concludes that plaintiff physicians and the AMA will suffer no injury.

The Secretary's argument correctly recognizes that plaintiffs' alleged injury is directly tied to the existence of a violation of the § 1395 prohibition on federal supervision or control of medical practice. But his arguments mistakenly focus on the existence of a statutory violation (which he denies) rather than plaintiffs' standing to complain of the alleged violation if it exists.

In arguing the merits of plaintiffs' claim that a statutory violation exists, defendant has exceeded the scope of the inquiry raised by a standing challenge. Standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The relevant inquiry is whether plaintiffs have alleged an actual or threatened injury to themselves that is likely to be redressed by a favorable decision. *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 2637–39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). They need not show that that decision will in fact be in their favor. Hence, plaintiffs here need not show on the standing issue that the MAC regulations violate § 1395 in order to show a cognizable alleged injury. To require otherwise would force plaintiffs to establish the validity of their claim for relief as a prerequisite to invoking federal jurisdiction. It would also violate the principle that "standing in no way depends on the merits of plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Consequently, the only question before us is whether the complaint shows alleged unlawful conduct by the Secretary which, if established, will cause a sufficient injury to plaintiffs to satisfy standing requirements. That alleged injury consists of "supervision or control over" plaintiffs' medical practice by effectively requiring them to prescribe only MAC-listed drugs, contrary to 42 U.S.C. § 1395. The MAC regulations will have this effect, say plaintiffs, because federal reimbursement will be limited to the least expensive MAC drugs and because hospitals and pharmacies providing drugs to patients will not furnish more costly drugs for which they cannot receive full reimbursement. Both of these rationales omit any specific allegation that plaintiff physicians or the AMA, will be financially in-

---

**8.** The term "non-MAC drugs" is a misnomer since the regulations specify only the amount of reimbursement, not which drugs are eligible for reimbursement. For the sake of brevity we use the term to refer to drugs which cost more than MAC limits.

jured by the regulations. This omission probably reflects the fact that physicians are generally not reimbursed for drug costs under Medicaid and Medicare programs, except when the drugs cannot be self-administered, are commonly provided incident to an office visit or hospital outpatient arrangement, and are reflected in the physician's overall bill. See 42 U.S.C. §§ 1395k, 1395x(s)(2). In cases where hospitals or pharmacies provide the drugs, plaintiffs' allegations, insofar as they suggest financial injury, are reducible to the claim that physicians will tend to prescribe MAC-listed drugs so that hospitals and pharmacies will receive full reimbursement and so that patients will not have to take up the slack. This general absence of direct financial impact partially attenuates the effect of the regulations on the physician's medical judgment.

The indirectness of this injury, "while not necessarily fatal to standing, 'may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendant's actions, or that prospective relief will remove the harm.'" *Simon v. Eastern Ky. Welfare Rights Organization, supra,* 426 U.S. at 44–45, 96 S.Ct. at 1927, quoting *Warth v. Seldin, supra,* 422 U.S. at 505, 95 S.Ct. 2197. In order to meet this burden, plaintiffs must show that their injury is or will be fairly traceable to the promulgation of the regulations and does not result from the independent action of some third party not before the court, and that the connection between the agency action and the alleged injury rests upon more than "remote possibilities" or "speculative inferences." *Eastern Ky. Welfare Rights Org., supra,* 426 U.S. at 42–43, 96 S.Ct. at 1926–27.

We believe that plaintiffs have demonstrated a sufficiently direct and perceptible connection between the disputed drug reimbursement limitations and the exercise of their medical judgment. First, there are some instances under the Medicare and Medicaid statutes in which the reimbursement limitations in the regulations would apply directly to physicians' bills irrespective of hospital or pharmacy drug policies. In these cases, it is plausible that the regulations pose a substantial likelihood that the doctor will prescribe only those drugs for which he himself may receive full reimbursement, at least where more costly drugs are not medically necessary although indicated for his patient. Second, even where the drugs are provided by hospitals or pharmacies rather than by the physician, it can readily be inferred from the allegations that these third parties will be less willing to provide non-MAC-listed drugs for Medicare and Medicaid patients for the sole purpose of avoiding the financial drain of uncompensated services.

Regarding these third parties, we believe the present case is distinguishable from *Eastern Ky. Welfare Rights Org., supra.* In that case, the Court denied standing to several organizations and indigent individuals who had claimed that certain government officials had "encouraged" the denial of hospital services to indigents by issuance of an Internal Revenue Service ruling which allowed favorable tax treatment to certain nonprofit hospitals which offered emergency room but not other hospital services to indigents. The Court held that it was purely speculative whether the alleged denials of hospital services were attributable to the defendants' encouragement, or resulted from independent decisions by the third party hospitals not traceable to tax considerations.

On the contrary, the alleged interference here is directly traceable to the defendant's regulations. It is fairly inferable from the complaint that the MAC regulations will not only discourage hospitals from making non-MAC-listed drugs available to Medicare and Medicaid patients, but will make it financially imperative for them to do so. But if the regulations are withdrawn, the impediment to professional judgment will disappear. The injury here is therefore both more direct and perceptible than that at issue in *Eastern Ky. Welfare Rights Org.* and it is certain that the prospective relief

which plaintiffs seek will remove the alleged harm.

Finally, this case contains elements of statutorily-conferred standing which were absent from *Simon.* Even if physicians would generally suffer little direct financial injury from the MAC regulations, they have alleged a different category of intangible injury, for their independent professional judgment is explicitly protected by 42 U.S.C. § 1395. In this connection, the Court has stated in *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973), that

> Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury exists without the statute.

Thus it appears that statutes like § 1395 can create interests which establish the conditions for cognizable injury. And as the Court observed in *Association of Data Processing Service Organizations, Inc., v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action."

Nevertheless, the presence of an interest expressly conferred by statute does not dilute the requirement of a direct and palpable injury to that interest. *Eastern Ky. Welfare Rights Org., supra,* 426 U.S. at 41, n.22, 96 S.Ct. at 1926, n.22. In the present case, however, we believe the threatened interference with a physician's prescription practices—that the regulations "would permit a handful of HEW employees, who need not be physicians, effectively to dictate the precise medication which private physicians must prescribe" (Complaint, ¶ 14)—constitutes a distinctive and recognizable harm to an intangible interest. To require more precise and intricate allegations would be inconsistent with modern pleading requirements.

Therefore, we hold that the allegations are sufficient to confer standing upon the plaintiff physicians. With respect to the plaintiff professional association, the Court has made it clear that even in the absence

of injury to itself, an association may have standing as the representative of its injured members. *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. 2197; *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Simon v. Eastern Ky. Welfare Rights Organization, supra,* 426 U.S. at 39–41, 96 S.Ct. at 1925. Consequently, both the plaintiff physicians and the AMA are entitled to invoke this court's jurisdiction. The Secretary's motion to dismiss these plaintiffs for lack of standing is denied.

## III. THE MERITS

### A. *Reimbursement Standards*

The first issue raised by AMA's motion for judgment on the pleadings and the Secretary's motion for summary judgment is whether the MAC regulations were issued in excess of the Secretary's authority and whether they violate the reimbursement standards provided under the Social Security Act. General authority for the promulgation of regulations pertaining to the Act is granted to the Secretary under 42 U.S.C. § 1302, which provides that the Secretary

> . . . shall make and publish such rules and regulations, not inconsistent with [the Social Security Act], as may be necessary to the efficient administration of the functions with which [he] is charged under [the Act].

Section 1302 gives the Secretary "broad rule-making powers," *Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 277 n.28, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), and grants him the authority to enact any regulation which is reasonably related to the purposes of the Act and consistent with the enabling legislation. *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841, 844 (5th Cir. 1974). The construction of a statute by one charged with its execution should be followed unless there are "compelling indications" that he is wrong. *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Because of the deference generally accorded to the administra-

tor's interpretation of a statutory scheme, a heavy burden lies on those who challenge the validity of the Secretary's regulations. *Johnson's Professional Nursing Home, supra; State of Florida v. Mathews,* 526 F.2d 319, 323 (5th Cir. 1976).

Given these standards of review, the starting point for our statutory analysis is the identification of the different categories of drug services provided under the Medicare and Medicaid programs.[9] Then the different reimbursement standards which apply to each of the various subdivisions of these programs will be analyzed in light of the MAC regulations. It will be apparent that the interplay of these different categories of drug services and different reimbursement standards provides a moderate degree of technical complexity.

Medicare, 42 U.S.C. § 1395 *et seq.,* is a nationally uniform federal program of health insurance for the aged and the disabled. It is completely financed and administered by the federal government through the Social Security Administration. Medicare is divided into two parts. Part A, 42 U.S.C. § 1395c–1395i, provides federal insurance for inpatient hospital services, post-hospital extended care services (including nursing home services), and post-hospital home health services. This "basic Medicare" program covers the cost of "drugs and biologicals" ordinarily furnished to patients for use in hospitals or extended care facilities, 42 U.S.C. § 1395d, § 1395x(b)(2), (h)(5), (j)(7), but not those provided to homebound patients, 42 U.S.C. § 1395x(m)(5). Part B of Medicare, 42 U.S.C. § 1395j–1395w, establishes a voluntary supplemental insurance program for aged and disabled individuals. It provides protection against the costs of physicians' services and a variety of medical services and equipment which are furnished in and out of medical institutions and which are not covered by the basic plan. This "supplementary Medicare" program covers only the cost of drugs and biologicals which (1) cannot be self-administered, (2) are incidental to a physician's services to patients in his office or to hospital outpatients, (3) are of a kind commonly furnished in physicians' offices, and (4) are commonly rendered without charge or included in the physician's bill. 42 U.S.C. § 1395k, § 1395x(s)(2). Thus, only a small percentage of drugs, such as injections, are covered under Part B of Medicare. In sum, both Part A and Part B of Medicare generally limit coverage to those drugs which have a close nexus to supervised institutional care.

Medicaid, 42 U.S.C. § 1396 *et seq.,* is a federal-state cooperative program that enables participating states to furnish medical assistance to individuals whose economic resources are insufficient to meet the costs of necessary medical care. States electing to participate in the program must submit a plan for approval by the Secretary. Upon approval, the state becomes entitled to federal matching funds to finance the program. Each state has considerable discretion in designing the contours of its program within the guidelines established by 42 U.S.C. § 1396a. The Medicaid program covers physicians' services, extended care services, inpatient and outpatient hospital services, and a wide range of other specified medical services for the needy. Under 42 U.S.C. § 1396d(a)(12), state Medicaid plans may include the costs of all "prescribed drugs," including those furnished in health care institutions and those purchased at pharmacies.[10] Thus, Medicaid potentially provides a more extensive range of coverage for drug costs than Medicare.

The reimbursement standard for all payments under basic Medicare (Part A) and for those payments made to hospitals and extended care facilities under supplementary Medicare (Part B) is the *lesser* of (1) the "reasonable cost" of the services provided, or (2) the "customary charge" for those

---

**9.** The Medicare and Medicaid programs were added to the Social Security Act, 42 U.S.C. Chapter 7, in 1965. Provisions of the Medicare and Medicaid statutes of particular relevance to the MAC regulations were added by amendment in 1967 and 1972.

**10.** Drug coverage is optional with the states. *See* 42 U.S.C. § 1396d(a).

services. 42 U.S.C. § 1395f(b)(1), § 1395*l* (a)(2). The reasonable cost portion of this standard provides the upper limit of permissible reimbursement.[11]

The definition of reasonable cost is found in 42 U.S.C. § 1395x(v)(1)(A), which was amended in 1972 to provide explicitly for the exclusion of unnecessary costs in accordance with regulations promulgated by the Secretary. Act of Oct. 30, 1972, Pub.L. No.92–603, § 223. The key phrase of this section provides that

> "the reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found [by the Secretary] to be unnecessary in the efficient delivery of needed health services."

The meaning of this phrase is analyzed below, but we note here that the parties consider this language to have pivotal significance in this case. The parties also declare that this phrase constitutes the basic statutory reimbursement standard governing almost all drug reimbursements under Medicare and Medicaid, but this simplification is not easily extracted from the language of the other reimbursement standards which are provided under these programs.

The reimbursement standard for payments made under supplementary Medicare (Part B) to providers *other than* hospitals and extended care facilities (e. g., physicians, laboratories, ambulance services and medical suppliers) is based on the "reasonable charge" for the services provided. 42 U.S.C. § 1395*l*(a)(1), § 1395k(a)(1), § 1395x(s). While "reasonable charge" is not defined in these provisions, Congress in 1972 amended a different section (42 U.S.C. § 1395u(b)(3)) which indicated that reimbursement for "reasonable charges" should be governed by substantially the same considerations of necessity and efficiency as are employed in the "reasonable cost" standard of § 1395x(v)(1)(A). Thus, the fourth sentence of § 1395u(b)(3) provides that post-1972 increases in physicians' charges can be recognized only to the extent that the Secretary finds, on the basis of area economic indices, that such increases are justified by changes in operating expenses and earning levels of physicians.[12] This ceiling on physician charges indirectly limits reimbursement for certain drug expenditures to a "reasonable cost" level, because it controls payment of the physicians' bill for his professional services and that bill may in turn include specific charges for drugs administered by the physician as an incident to his

---

11. The "customary charge" portion of this standard was added by Congress in 1972, because application of the reasonable cost standard alone had meant that in some cases the reimbursement to health care institutions for the *cost* of services to Medicare beneficiaries had exceeded institutional revenues derived from *charges* for the same services to the public generally. Thus, some providers had set charges to non-Medicare patients which were below cost, recouping the difference from endowment or investment income. To equalize payment for services rendered to Medicare and non-Medicare patients, Congress enacted this section (Section 233 of P.L. 92–603) to limit reimbursement payments to "customary charges" when those charges are less than reasonable costs. See S.Rep.No.92–1230, 92d Cong., 2d Sess., 202–03 (1972). However, to provide a lower limit to this customary charge standard and to avoid discouraging providers who furnished services free of charge or at a minimal fee, Congress authorized the Secretary to establish regulations which would provide "fair compensation" for such low-charge services. 42 U.S.C. § 1395f(b)(2), § 1395*l*(a)(2)(B).

From this analysis we conclude that the "customary charge" standard generally represents the lower limit on reimbursement for these portions of the Medicare program, with the absolute floor to be determined by the Secretary consonant with a standard of "fair compensation." Furthermore, we note at this juncture that because this section authorizes a health care institution to be reimbursed for less than the costs it has incurred, it is conceivable that reimbursement may in some cases be even *less* than the "maximum allowable cost" for prescribed drugs which is set by the MAC regulations.

12. The basic reimbursement level for physicians' services cannot exceed the 75th percentile of customary charges for that service in the physician's locality in 1972. The purpose of the fourth sentence of § 1395u(b)(3) was to tie increases in the reimbursement levels to other changes in the economy and to assure that the Medicare program followed rather than led any inflationary trends. S.Rep.No.92–1230, 92d Cong., 2d Sess. 190–92 (1972).

professional services. See 42 U.S.C. § 1395x(s)(2).[13] And in the fifth sentence of its 1972 amendments to 42 U.S.C. § 1395u(b)(3), Congress went even further and indicated that these included drug costs are subject to perhaps a more stringent standard than "reasonable costs." Thus, the fifth sentence provides that, with respect to medical supplies, services and equipment which, "in the judgment of the Secretary," do not generally vary in quality from one supplier to another, charges "may not exceed the *lowest charge levels* at which such services, supplies and equipment are widely and consistently available in a locality. . . ." (emphasis added.) Drugs furnished as an incident to a physician's services are explicitly included as "services and supplies" in 42 U.S.C. § 1395x(s)(2). Thus the Secretary may use a "lowest available cost" rather than a "reasonable cost" formula in determining the "reasonable charges" for drug services offered by the Medicare providers covered by § 1395*l*(a)(1) and § 1395k(a)(1). Because this formula appears to be even stronger than that provided by § 1395x(v)(1)(A), it is difficult to reconcile the two provisions.

◼ A similar problem exists with the Medicaid reimbursement standards. The basic reimbursement standard for medical care and services under Medicaid is set out in 42 U.S.C. § 1396a(a)(30). This section was added in 1967[14] and requires the states to establish methods and procedures designed to assure that payments for "any drugs" under Medicaid will not exceed "reasonable charges consistent with efficiency, economy and quality of care." This language is not defined in the statute nor in its legislative history. It strikes us as a hybrid of the reasonable cost and reasonable charge standards for while the language uses the term "reasonable charges" rather than "reasonable costs," it incorporates the "efficiency" criterion of the

§ 1395x(v)(1)(A) definition. Because Medicaid is a federal-state cooperative program and state methods and procedures must be approved by the Secretary to assure conformity with federal law, it is reasonable to infer that Congress vested responsibility in the Secretary to give meaning to the language. The Secretary has promulgated regulations under Medicaid which indicate that standards and principles used regarding payment for Medicare services are generally applicable regarding Medicaid services. Thus the regulations provide that reimbursement for inpatient hospital services is limited to reasonable costs under Medicare and reimbursement for extended care and non-institutional services is limited to reasonable charges under Medicare. 45 C.F.R. § 250.30. Another indication that Medicaid incorporates Medicare standards is provided by the reimbursement standard in § 1396a(a)(13)(D) of Medicaid. That section was added in 1972,[15] five years after the addition of § 1396a(a)(30), and provides that states shall develop their own methods and standards for determining the "reasonable cost" of inpatient hospital care for Medicaid recipients, subject to advance approval by the Secretary and also subject to the condition that reimbursement by the states could in no case exceed the reasonable cost standard provided in § 1395x(v)(1)(A) of Medicare.

◼ Despite the overlapping between §§ 1395x(v)(1)(A), 1395u(b)(3), 1396a(a)(30) and 1396a(a)(13)(D), we hesitate to conclude that the last three of these four sections create standards of reimbursement identical to that created by the first. Although the three provisions employ similar standards of reasonableness and efficiency, each has peculiar features which distinguish it from § 1395x(v)(1)(A). The fifth sentence of § 1395u(b)(3) leaves quality determinations to the "judgment" of the Secretary and leaves excessive cost determinations subject

---

13. As noted earlier, see page 1192 *supra*, because only a fraction of drugs are covered by this provision of the supplementary Medicare program, its impact in the present case is less comprehensive than the more general provisions found in § 1395f(b) and § 1395*l*(a)(2).

14. Act of Jan. 2, 1968, Pub.L.No.90–248, § 237(b), 81 Stat. 911.

15. Act of Oct. 30, 1972, Pub.L.No.92–603, § 232(a), 86 Stat. 1411.

to such exceptions as he specifies. In contrast, § 1395x(v)(1)(A) requires determinations of unnecessary and unreasonable costs to be made in accordance with "methods" established by regulations which the Secretary prescribes. With respect to Medicaid, § 1396a(a)(13)(D) incorporates § 1395x(v)(1)(A) (Medicare "reasonable cost") by reference, but § 1396a(a)(30) does not. Also, the unifying impact of this incorporation is reduced by the fact that § 1396a(a)(13)(D) applies only to the narrow category of drugs provided incident to inpatient hospital services while § 1396a(a)(30) applies to "any drugs." Furthermore, the legislative history of these Medicaid provisions indicates that Congress intended to encourage and preserve a wide measure of state autonomy and experimentation in the determination of the reasonable costs of Medicaid programs.[16] These considerations are absent from the Medicare program, which is administered solely on the federal level. These differing legislative policies have led to reimbursement standards with different cost methodologies. Under Medicaid, responsibility for developing methods and standards for cost determinations under § 1396a(a)(13)(D) is assigned initially to the states, while under Medicare, § 1395x(v)(1)(A), complete responsibility is assigned to the Secretary. Similarly, § 1396a(a)(30) by its terms does not require formal findings regarding efficiency, economy and quality of care, but § 1395x(v)(1)(A) does. Finally, to add to the confusion and complexity of the program interaction, a third provision of the Medicaid statutes incorporates another Medicare reimbursement standard by reference. Thus § 1396b(i)(1) was enacted in 1972 to prohibit federal reimbursement for state Medicaid payments for "items or services" whose charges exceeded the standards provided in the fourth and fifth sentence of § 1395u(b)(3). As noted earlier, that section utilized a "lowest charge level . . . widely and consistently available" standard.

 Given this maze of reimbursement standards applicable to different categories of drug costs and charges under two different health care programs with different methodologies and philosophies of administration, it is indeed difficult for us to nail down any one reimbursement standard for the purpose of evaluating the consistency of the MAC regulations with the legislative scheme. But we believe that the "reasonable cost" standard of § 1395x(v)(1)(A) is most immediately relevant to the present controversy and most clearly embodies the Congressional formula for preventing reim-

16. When § 1396a(a)(13)(D) was first passed by the House, it authorized the states to develop their own methods and standards for determining the reasonable cost of inpatient hospital care, subject to the § 1395x(v)(1)(A) "reasonable cost" limitation. H.R.Rep.No.92–231, 92d Cong., 1st Sess., 317 (1971), U.S.Code Cong. & Admin.News 1972, p. 4989. The House Report was explicit, however, in granting more freedom and flexibility to the states to work out satisfactory payment arrangements with their hospitals without being rigidly controlled by that standard as a lower as well as an upper limit:

Several States have objected to [the reasonable cost formula set forth in Medicare] asserting that use of the medicare formula for medicaid reimbursements can result in their paying more than the actual cost of providing inpatient care to those eligible for medicaid. There is nothing in the legislative history which requires that reasonable cost should be defined precisely the same way for both programs, and there are reasons why they should not, such as the differing characteristics of the two populations served. . . . the States should not be unduly restricted in the methods with which they might experiment for payment of inpatient hospital services. (*Id.* at pp. 100–101), U.S.Code Cong. & Admin.News 1972, p. 5087.

The Senate deleted the House provision, fearing that it might "provide the opportunity for states to reimburse hospitals under medicaid at less than the cost of medicaid services." S.Rep.No.92–1230, 92d Cong., 2d Sess., 325 (1971). However the conference committee restored the House provision with the added proviso that the methods used by the states would be subject to advance approval by the Secretary. H.R.Rep.No.92–1605, 92d Cong., 2d Sess., 53 (1972), U.S.Code Cong. & Admin. News 1972, p. 5370. Presumably, the Secretary could disapprove a state method that failed to conform to federal Medicare regulations. However, it is conceivable that the range of state autonomy encompasses the approval of methods which are less generous than the reasonable cost standard under § 1395x(v)(1)(A) of Medicare.

bursement for excessively priced medical items and services. Several considerations impel us to this conclusion. First, § 1395x(v)(1)(A) applies directly to the great proportion of drugs covered by the Medicare and Medicaid programs. Congress has directed that the reasonable cost formula of that section be applied concurrently to all payments under basic Medicare, to payments made to hospitals and extended care facilities under supplementary Medicare, and by reference in § 1396a(a)(13)(D) to inpatient hospital costs under Medicaid. By contrast the "reasonable charge" limitation sections apply to a narrower category of drugs and attack the cost problem indirectly by limiting charges in bills for professional services. Second, § 1395x(v)(1)(A) is the most specific and fully developed formula for reimbursement. We recognize that all of the sections embody broad terminology of efficiency, economy, necessity and quality of care, and that these terms require administrative interpretation. However, § 1395x(v)(1)(A) contains the most complete methodology of determining unnecessary costs and is the only one to express that determination in formulistic terms. In the case of competing and overlapping statutes, legislative intent is most reliably expressed in the statute where the attention to detail and to precision are the most manifest. Finally, a reimbursement scheme which disburses different amounts for drug costs to providers who furnish identical services to Medicare and Medicaid patients, or who furnish identical services to the same patients in different circumstances, tends to be illogical, inefficient and uneconomical. The interest in a uniform policy of drug reimbursement is strong. However, we note that under the present Medicaid scheme, some deviations from the § 1395x(v)(1)(A) are allowed on the state level. But those deviations in reimbursement may in no case exceed the reasonable cost level provided in that section. Therefore, we conclude that § 1395x(v)(1)(A) provides the applicable reimbursement standard against which the validity of the MAC regulations must be tested.

Plaintiffs raise numerous arguments alleging that the MAC regulations violate § 1395x(v)(1)(A). To repeat, the crucial language of that section provides that:

"The reasonable cost of any services shall be the *cost actually incurred*, excluding therefrom any part of incurred cost *found* to be *unnecessary in the efficient delivery of needed health services*, and shall be determined in accordance with regulations establishing the *method* or *methods* to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services. . . . " (emphasis added to reflect terms the plaintiffs deem significant.)

In summary, plaintiffs contend that (1) the MAC regulations inflexibly limit reimbursement to a lower level than "cost actually incurred," (2) the Secretary has not "found," nor do the regulations provide for findings, that drug costs above maximum allowable costs are "unnecessary in the efficient delivery of needed health services," (3) such findings, assuming they were made, were not determined in accordance with preestablished "methods" and procedures, and (4) even assuming such findings were made and such methods were followed, Section 1395x(v)(1)(A) was only intended to curb aberrant extravagance and program abuse by specific health providers, not across-the-board limits on the costs of standard medical supplies purchased on the market.

Plaintiffs' first contention, that the MAC regulations violate this section by inflexibly basing reimbursement on the cost of a MAC drug rather than on the "cost actually incurred" by the provider, relies upon a misconstruction of the statute. Reimbursement under this section was never intended to be based solely on a provider's actual costs. The language of the statute explicitly excludes payments for incurred costs which are unnecessary. Furthermore, in enacting this provision Congress sought to limit costs to "those that would be incurred by a reasonably prudent and cost-conscious management," not those that are

actually incurred by any health care institution regardless of its operating efficiency. S.Rep.No.92–1230, 92d Cong., 2d Sess., 187 (1972). The MAC regulations seek to implement this Congressional directive by disallowing unnecessary and unreasonable incurred costs. Moreover, § 1395x(v)(1)(A) is not a monolithic lower limit for Medicare or Medicaid reimbursement. The alternative "customary charge" standard of reimbursement under § 1395f(b)(1) and § 1395*l*(a)(2) requires below-cost reimbursement for certain services provided at nominal charge. The obvious conclusion is that § 1395x(v)(1)(A) does not require reimbursement of all actual costs. Rather, it limits reimbursement to a level no higher than actual costs and sets broad standards for the subtraction of excessive and unnecessary costs from that figure.

We also reject plaintiffs' argument that the Secretary has not found, and the regulations fail to make or require a finding, that the difference in price between a MAC drug and a drug actually prescribed represents costs which are "unnecessary in the efficient delivery of needed health services." We note first that the Secretary is empowered to make findings of broad scope and application. The legislative history of the 1972 amendments of § 1395x(v)(1)(A) makes clear that the Secretary was not confined to retrospective determinations of reasonable costs on a case-by-case basis. Separate findings as to necessity do not have to be made each time a provider seeks reimbursement for drug costs. Rather, the amendments authorized the Secretary to prospectively establish the reasonable cost for items and services on a class and presumptive basis. S.Rep.No.92–1230, *supra*, at 188. In the "basis and purpose" statement published with the final regulations in the Federal Register, the Secretary made findings on exactly this basis:

What the Secretary is determining by issuing the MAC regulation is that portions of the costs of certain drugs are unnecessary to the efficient delivery of quality health care. This determination is based upon a recognition of the fact that a number of drugs containing the same active ingredients in the same dosage forms and strengths are available from different formulators and labelers at significantly different prices. In light of this fact, and in the interest of the efficient administration of the duties with which the Secretary is charged, consistent with quality care, the MAC regulation is issued to take advantage of these varying multiple-source prices.

40 Fed.Reg. at 32288.

Under the MAC regulation, the Secretary is determining only that portions of the cost of certain drugs are unnecessary to the efficient delivery of needed health services. Cost limits are established representing those estimates of drug costs which are necessary. Necessary costs are recognized as reasonable costs and are fully reimbursable.

40 Fed.Reg. at 32289.

These findings are sufficient to satisfy § 1395x(v)(1)(A)'s requirement that an exclusion from actual cost be "found to be unnecessary."[17] Individual findings on a prescription-by-prescription basis are not required.

Plaintiffs also attack these findings on the ground that they were not made pursuant to methods and procedures for cost determinations that are required by § 1395x(v)(1)(A). Plaintiffs rely on the second clause of that section, which provides that the reasonable cost of any services " . . . shall be determined in accordance with regulations establishing method or methods to be used, and the items to be included, in determining such

---

17. Plaintiffs have also argued that these conclusions constitute unreasoned findings which are based on an assumption of drug equivalence which is warranted neither by the statute nor by practicalities. In our view this argument raises the issue of whether the Secretary's findings were arbitrary, capricious and without a rational basis in the record. It therefore presents factual issues which have not been properly raised in AMA's present motion for judgment on the pleadings. This issue has been properly raised, however, by plaintiff-intervenor PMA's motion for summary judgment and is considered below.

costs for various types or classes of . . . services . . . " Plaintiffs read this section as requiring the Secretary to make precise, economically justifiable findings that portions of costs in specific drug categories are unnecessary and to establish procedures in advance for making such findings. They characterize the Secretary's findings, as well as the MAC regulations, as nothing more than "pre-emptory declarations" and "blanket limitations," because the findings summarily treat all drug costs in excess of all future MAC limitations as unnecessary, and because the regulations direct the Pharmaceutical Reimbursement Board to choose the lowest-priced multiple-source drug which is widely and consistently available without any procedures for determining the necessity of those particular limitations.

We agree with the plaintiffs that § 1395x(v)(1)(A) requires the Secretary to devise regulations establishing a method for determining what costs are unnecessary to the efficient delivery of drug-related health services. We believe, however, that the procedures established by the MAC regulations satisfy this requirement. The Pharmaceutical Reimbursement Board does not, as plaintiffs charge, simply ascertain the lowest price at which a drug is sold and then summarily conclude that all costs above that figure are unnecessary. Admittedly, during the MAC process the Board is directed to determine the lowest unit price as a convenient starting point in a process which is heavily dependent upon the competitive pricing of drugs on the open market. But this is only a single step in the detailed process outlined by the MAC regulations. This process begins when the Board identifies a multiple-source drug and sends the name of the drug to the FDA for review of certain of its technical aspects. After referral to the FDA, the Board determines the lowest unit price at which the

drug is widely and consistently available. This figure is sent to the Pharmaceutical Reimbursement Advisory Committee which reviews the appropriateness of proposing that or any MAC for the drug.[18] The Board then publishes notice of the proposed MAC and takes public comments before deciding whether to finalize the lowest unit price, or a higher figure,[19] as the MAC limit. It is only after a particular multiple-source drug, which is both widely and consistently available, successfully passes through the MAC procedures that the Secretary concludes that all costs above the figure which is ultimately adopted as the MAC limit are unnecessary.

 We conclude that the Secretary is not required to supplement this methodology with elaborate and distinct findings regarding each item of unnecessary cost. The MAC regulations were properly promulgated under the "notice and comment" procedure of the Administrative Procedure Act, 5 U.S.C. § 553, which only directs the agency to "incorporate in the rules a concise general statement of their basis and purpose." The APA does not require a statement of findings of fact. Neither does § 1395x(v)(1)(A). Moreover, extensive findings are essentially incompatible with the quasi-legislative character of the rule-making process. *Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 501 F.2d 722, 734–35 (1974).

In short, we hold that the MAC regulations themselves constitute the methodology contemplated by § 1395x(v)(1)(A).

Plaintiffs' next contention is that the Secretary cannot properly find that drug costs above MAC levels are unnecessary without contravening the legislative intent behind § 1395x(v)(1)(A). According to their theory, that section was only intended to authorize cost controls on health care institutions which were inefficient and which charged excessive costs relative to compara-

---

18. "The Committee shall review each determination [of lowest unit price] and shall . . . provide the Board its advice concerning the Board's determination of lowest unit price *and the appropriateness of proposing a [MAC]."* § 19.5(d). (emphasis added.)

19. Section 19.5(i) grants the Board the ultimate authority to decide whether to establish a MAC and at what level to set it.

ble providers operating in similar circumstances, and was not meant to allow across-the-board cost controls on all providers with respect to standard medical supplies purchased on the market.

We believe Congress intended its economizing measure to cover more than merely the problem of the spendthrift. The committee reports support the plaintiffs' theory in that they indicate that the precipitating stimulus for the enactment of § 1395x(v)(1)(A) was a desire to establish limits on differences in provider costs which flowed from marked inefficiency in operation or conditions of excessive service. See S.Rep.No.1230, *supra*, at 187. But that report went on to specify not only techniques for weeding out inefficient institutions, but also techniques for setting across-the-board limitations on costs. These limitations could cover such items as laundry costs, medical record costs and administration costs (which did not vary with the quality and intensity of medical care), as well as such items as overall costs per patient day (which did vary with those same indicia of medical care). The report also recognized that "special limits could be established on cost elements found subject to abuse." *Id.* at 189.[20]

Furthermore, § 1395x(v)(1)(A) must be interpreted in light of a six-year Congressional experience with spiraling expenditures under the Medicare program. To combat this problem, Congress in 1972 enacted not only § 1395x(v)(1)(A), but a number of provisions designed to save money by encouraging the efficient provision of health care services. Section 222(a) of those amendments authorized the Secretary to conduct experiments and demonstration projects to determine whether changes in reimbursement methods "would have the effect of increasing the efficiency and economy of health services . . . without adversely affecting the quality of such services." 42 U.S.C. § 1395b–1(a)(1)(A). Similarly, sections 223, 224 and 233 of the 1972 amendments authorized the Secretary to exercise his judgment to limit Medicare costs and charges. Section 223 is codified as § 1395x(v)(1)(A), and it provides broad criteria for the determination and exclusion of unnecessary costs. When an act expresses such a major policy of government in such general terms, the fact that the committee reports omit a specific reference to a particular method of agency action to carry out that policy is not fatal to the agency's asserted power. The draftsmen of statutes delegating agency powers do not normally include specific consideration of every evil sought to be corrected, but instead expect the agency to use its expertise to combat new abuses as they arise. *American Trucking Associations v. United States*, 344 U.S. 298, 309–10, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Therefore we reject the assertion that the Secretary's findings on unnecessary drug costs represent an attempt to expand his power beyond the scope of the

---

**20.** The legislative history concerning § 1395u(b)(3) is even more expansive in describing the scope of the Secretary's authority. The Senate report on that section clearly expressed its intention to

"make explicit the Secretary's authority . . . to impose rules for determining reasonable charges when, after due consideration, he determines that a particular item or service does not vary in quality from one supplier to another and devises special rules for reasonable charge determinations that he considers equitable and administratively feasible." S.Rep.No.92–1230, *supra*, at 193. Furthermore, the report noted that while § 1395u(b)(3) was directed to items and services of unvarying quality, "present law provides authority for special reasonable charge rules and limits with respect to *any* items or

services for which such special rules are found to be necessary or appropriate." *Id.* at 193 (emphasis added). The Senate Report even provides an example which endorses the "maximum allowance" concept:
"Where a separate charge is made by a physician for an injection, for example, the maximum allowance should be a scheduled amount based upon the approximate ingredient and supply cost plus a modest specified amount (such as $1 or $2) to cover the injection service." *Id.* at 193.
The report also suggested that the costs of laboratory tests should be based upon those "undertaken by qualified, efficient and economical sources—such as independent automated laboratories." This concern for finding the most efficient provider or an equivalent service parallels the purpose of the MAC regulations.

statutory framework. Those findings were clearly directed at eliminating costs which he deemed to be "unnecessary in the efficient delivery of needed health services" within the meaning of § 1395x(v)(1)(A). And given the deference ordinarily accorded to an administrator's statutory interpretations, the MAC regulations are a lawful means of achieving that objective.

Nevertheless, plaintiffs argue, Congress has rejected bills and proposals that would have specifically given the Secretary the authority to establish a MAC-type system of drug reimbursement. However, nearly all of the bills which they cite would impose much stricter federal controls over drug reimbursement than those established by the MAC regulations. The bills generally proposed a formulary system which would limit reimbursement for drug costs and would also restrict types of drugs for which reimbursement could be sought. The MAC regulations only set reimbursement limitations and do not exclude any drug from potential coverage under Medicare or Medicaid. Furthermore, all of the cited bills, with one exception, were referred to Congressional committees. We have been given no citation, and have found none, which indicates that these bills have received any further or final action. The mere introduction of a bill has no probative value for purposes of statutory interpretation. *Order of Railway Conductors of America v. Swan*, 329 U.S. 520, 529, 67 S.Ct. 405, 91 L.Ed. 471 (1947). The exceptional bill, which proposed a formulary system,[21] was dropped in the conference committee [22] and was replaced by a broad compromise provision which is not inconsistent with the development of a MAC system.[23] In any event, unsuccessful attempts at legislation are not the best of guides to legislative intent. *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 382 n. 11, 89 S.Ct. 1794,

23 L.Ed.2d 371 (1969). Legislators may merely wish to make clear what form a program should take rather than leave its details to an administrator's discretion. Similarly, the fact that Congress has failed to adopt HEW recommendations for specific limitations on drug reimbursement does not establish that such a proposal is excluded from a general provision on the subject. *Cf. Helvering v. Clifford*, 309 U.S. 331, 337, 60 S.Ct. 554, 84 L.Ed. 788 (1940). Instead, Congress may have preferred to retain generalized treatment of the subject under the broad language of § 1395x(v)(1)(A). We conclude that Congress has not specifically rejected a MAC system and that such a system is not manifestly inconsistent with Congressional intent.[24]

Plaintiffs also argue that the MAC regulations violate a section of the Social Security Act which is peripherally related to those sections establishing reimbursement standards. The section is 42 U.S.C. § 1395x(t), which defines "drugs" and "biologicals" to:

. . . include only such drugs and biologicals . . . as are included . . . [in the drug compendia of specified medical and pharmacological organizations], . . . or as are approved by the pharmacy and drug therapeutics committee (or equivalent committee) of the medical staff of [participating] hospital(s)

. . .

This section was enacted in 1965 and has never been amended.

Plaintiffs first assert that § 1395x(t) mandates full reimbursement and program coverage for all drugs listed or approved in accordance with that section. They argue that the MAC regulations, by providing full reimbursement for MAC drugs and only partial reimbursement for drugs which cost more than MAC limits and which may be so listed or approved, effectively limit drug coverage to a more re-

---

**21.** The bill is reported at 113 Cong.Rec. 33518 (1967).

**22.** *Id.* at 36369.

**23.** The provision is presently codified as 42 U.S.C. § 1396a(a)(30).

**24.** The preceding discussion disposes of plaintiffs' arguments that the MAC regulations violate the following sections of Title 42: 1395f(b), 1395*l*(a)(1) and *l*(a)(2), 1395u(b)(3), 1395x(v)(1)(A), 1396a(a)(13)(D), 1396a(a)(30) and 1396b(i)(1).

stricted category of drugs than those specified in § 1395x(t). We reject this strained interpretation of the statute and of the MAC regulations. The statute was intended to limit payment to only those drugs which were approved by responsible and competent medical organizations. It does not *require*, but instead *permits*, reimbursement for all drugs which are approved by the mechanisms specified by the statute. The legislative history supports this reading:

> The intent of the provisions for determining which drugs and biologicals are covered is to *permit* payment for all drugs and biologicals which medical and medically related organizations have evaluated and selected as being proper for use in the course of good patient care.
>
> 1965 U.S.Code Cong. & Ad.News at p. 1969 (emphasis added).

The section was intended to protect patients against poor quality drugs, not to require the government to pay the full cost of all brands of a drug when a portion of that cost has been found unnecessary in the efficient delivery of medical care. Furthermore, the MAC regulations do not affect which drugs are *eligible* for reimbursement; rather, they affect only the *amount* of that reimbursement, and do so only where a physician has not certified that a prescribed drug which costs more than MAC levels is medically necessary for his patient.

Plaintiffs' second § 1395x(t) argument is that the MAC regulations unlawfully delegate the selection of covered drugs under Medicare and Medicaid to a committee of HEW employees (the Pharmaceutical Reimbursement Board) rather than to the medical organizations specified by § 1395x(t). We repeat that the MAC regulations determine reimbursable costs, not coverage, of drugs. The regulations do not interfere with the selection of drugs for inclusion in institutional formularies. They only establish upper limits on reimburse-

ment for certain multiple-source drugs. Therefore, we conclude that the regulations are not inconsistent with § 1395x(t).

In summary, the motion of the AMA plaintiffs for judgment on the pleadings regarding the violation of the reimbursement standards is denied; and the defendant's cross-motion for summary judgment on this issue is granted.

### B. *Alleged Violation of § 1395*

Plaintiffs next urge that the MAC regulations constitute unlawful supervision and control over the practice of medicine in violation of 42 U.S.C. § 1395. The section provides, in pertinent part, that:

> Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided . . . or to exercise any supervision or control over the administration or operation of any . . . institution, agency, or person [providing health services].[25]

In evaluating the merits of the § 1395 issue, it is helpful to identify at the start those propositions about which the parties agree. First, the MAC regulations will control the level of reimbursement for multiple-source drugs prescribed by physicians for Medicare-Medicaid patients. Second, the MAC limits on reimbursement will not apply where the physician certifies that the particular drug he has prescribed is medically necessary for his patient. Third, the regulations by their terms do not require nor ask the physician to prescribe only those drugs which fall within MAC levels or to alter his medical judgment concerning the proper drugs to prescribe for his patients. Fourth, the regulations will have some effect on the prescribing habits of physicians. The crucial question is whether this effect is sufficient to constitute "supervision or control" within the meaning of § 1395.

---

**25.** Defendants argue that § 1395 applies only to Medicare, while plaintiffs assert that it applies to Medicare and Medicaid. Because we hold that the MAC regulations fail to generate a sufficient *quantity* of interference to cause a § 1395 violation, we find it unnecessary to decide how broadly a hypothetical violation of § 1395 would apply to those programs.

Plaintiffs first argue that the test of interference under § 1395 is whether the regulations will have the practical effect of controlling professional judgment in a significant number of instances. Plaintiffs assert that they will, and contend that physicians will be effectively required to prescribe only MAC drugs because neither the hospitals, pharmacists and physicians that furnish the drugs, nor the Medicare-Medicaid patients who procure them, will be able or willing to shoulder the added unreimbursable cost of non-MAC drugs.[26] They argue, therefore, that the regulations will unlawfully restrict the physician's range of practical choice by introducing financial considerations into his decision as to the course of treatment to recommend to his patients.[27] He will be unable to prescribe care solely upon what he analyzes the patient's need to be and must weigh his diagnosis in terms of what the patient (or the hospital or pharmacy) can afford. Plaintiffs envision a situation where the physician will in many instances prescribe drugs which are different from those he would have prescribed in the absence of the MAC regulations.

Analysis of this argument necessitates an inquiry into the impact of cost controls on professional independence. Plaintiffs' prediction of a substantial impact on their medical practice is a claim which is beyond the scope of a motion for judgment on the pleadings and requires evidence for support. But if we assume the validity of their prediction, the resulting effect of the MAC regulations on the aggregate prescription practices of physicians does not fall within the prohibition of § 1395.

 Congress made it clear in 1972 that it did not view certain cost limitation

mechanisms as within the ambit of § 1395. By enacting a strengthened cost limitation section (§ 1395x(v)(1)(A)) and authorizing the Secretary to exercise extensive cost control powers, Congress struck a balance between cost controls and professional independence. This balance is not upset by the incidental effects predicted by plaintiffs. The legislative history of § 1395x(v)(1)(A) demonstrates that Congress wanted the judgmental process in the health care delivery system to be influenced and animated by a consciousness of the costs of medical care:

> Health care institutions, like other entities in our economy should be encouraged to perform efficiently and when they fail to do so should expect to suffer the . . consequences . . . . The committee believes that [these] objectives can only be accomplished by reimbursement mechanisms that limit reimbursement to the costs that would be incurred by a reasonably prudent and cost-conscious management. S.Rep.No.92–1230, *supra*, at 187.

In short, Congress did not intend to shield the medical decision-making process from financial consequences. If the MAC regulations have the effect of altering present drug prescription habits in the medical profession to reflect greater cost efficiency, that effect is consistent with Congressional intent.

We recognize, however, that Congress did not say that all cost control mechanisms are consistent with § 1395. Congress wanted full reimbursement to be accompanied by an informed medical decision that the incurred costs are necessary in the efficient delivery of health services. Thus, § 19.-3(a)(3) of the MAC regulations accommo-

---

**26.** It may be that physicians should not be considered in the class of providers of drugs, since they are generally not reimbursed for drug costs, except when those drug costs become reflected in their overall bill and the drugs are administered incidental to an office visit or are administered to hospital outpatients.

**27.** Plaintiffs also suggest that the MAC regulations will control prescribing practices by dis-

couraging hospitals and pharmacies from carrying non-MAC drugs and by thus making those drugs unavailable. But both hospitals and pharmacies will probably still carry inventories of non-MAC drugs to serve patients not covered by Medicare or Medicaid and to fill prescriptions for Medicaid and Medicare patients for whom the physician has certified the medical necessity of the non-MAC drug.

dates professional independence by providing reimbursement of "acquisition cost" or "usual and customary charge" if the physician certifies in his own handwriting that the prescribed drug is medically necessary for his patient. This exception to the MAC limits assures that any changes in physicians' drug prescription practices will result not from a coercive effect of the MAC regulations, but instead from an agreement by physicians that drug products priced within MAC limits will provide the same level of efficacy as that provided by costlier drug products. It is in precisely those cases where drug prescription judgments are controlled by medically unnecessary factors that the MAC regulations will have their greatest and most clearly intended, if not their only, impact on the medical practice. And Congress intended that impact as a permissible byproduct of cost controls, not an intrusion into professional independence.

Plaintiffs contend that the § 19.3(a)(3) certification provision does not save the MAC regulations from a § 1395 violation. They characterize the purpose of the handwritten certification (that a physician reflect for a moment on whether his patient needs a particular drug whose cost exceeds MAC levels) as intended to induce physicians to acquiesce in MAC determinations in close or uncertain cases and as introducing just the sort of bureaucratic interference with medical judgments that § 1395 was designed to prevent. They also perceive a gray area of "medically preferable" drugs between those which are and those which are not medically necessary, and think that physicians may reasonably shrink from making the handwritten certification for these drugs, even though the physicians believe these drugs are safer, more reliable, more effective, or more acceptable to their patients.

We cannot agree that the act of certification is a prohibited intrusion into the physician's medical practice. The handwriting requirement is no more onerous than putting pen to paper, as the physician already does in penning the prescription itself. Furthermore, certification is not intended to affect the physician's judgment but only to document that judgment and to prevent the certification process from becoming a *pro forma* ritual (if, for instance, the physician need only check off a box on the prescription form). In addition, requiring physicians to certify that particular services are medically necessary is not a novel mechanism. Even before the 1972 amendments, Congress required physicians to certify the medical necessity of tests and treatment for in-hospital, post-hospital and home health care. See 42 U.S.C. § 1395f(a).

Finally, plaintiffs have placed too narrow a construction on the certification provision by arguing that it will cover only medically necessary, but not medically preferable, drugs. The Secretary has given the certification provision a broad scope which minimizes, if not eliminates, plaintiffs' fear of an inhibition on medical judgments. The prescriber need only conclude, "on the basis of a comparative medical judgment," that a particular brand of a multiple-source drug is "better suited" than another brand for the patient's medical needs. 40 Fed.Reg. at 32295. The MAC regulations contain no provision for governmental review of the physician's certification.[28] We conclude that the MAC regulations do not constitute federal supervision or control over the practice of medicine within the meaning of § 1395.[29] Accordingly, the AMA plaintiffs' motion for judgment on the pleadings on this issue is denied and the defendant's cross-motion for summary judgment is granted.

**28.** These judgments may be reviewable by "Professional Standards Review Organizations" established by 42 U.S.C. § 1320c *et seq.* If so, the standard of review is based upon the "reasonable limits of professional discretion." 42 U.S.C. § 1320c(1). These statutes have been held to not interfere with a physician's right to practice his profession. *Association of Ameri-* can *Physicians & Surgeons v. Weinberger,* 395 F.Supp. 125 (N.D.Ill.1975), aff'd, 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1975).

**29.** *See Rasulis v. Weinberger,* 502 F.2d 1006 (7th Cir. 1974); *Association of American Physicians and Surgeons, supra.*

1204

## C. Rational Basis for Secretary's Findings

■ Our focus now shifts from a resolution of issues of statutory construction, which is a matter assigned primarily to a reviewing court, to a review of the findings and conclusions that form the basis for the regulations, which involve matters essentially within the competence of the administrator. Plaintiff-intervenor PMA raises two arguments in its motion for summary judgment that the Secretary's findings lack an adequate basis in the administrative record and are therefore invalid. These contentions require us to first analyze the appropriate standard to be applied in judging the adequacy of the findings in rule-making proceedings.

■ The MAC regulations were promulgated by the Secretary in accordance with the "notice and comment" provisions of Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553. The basic standard for review of this rule-making is whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); see generally, Davis, *Administrative Law Treatise*, § 29.01 *et seq.* (Supp. June, 1976). The scope of review is narrower under this standard than under the "substantial evidence" test applicable to more formal procedures under Section 7 and 8 of the APA, 5 U.S.C. §§ 556, 557. However, the Supreme Court has not clarified the meaning and scope of the "arbitrary and capricious" standard. In *Overton Park*, the Court stated that agency action is entitled to a "presumption of regularity" but that does not "shield [it] from a thorough, probing, in-depth review," yet the "ultimate standard of review is a narrow one." The reviewing court is to search for a "clear error of judgment," yet it cannot "substitute its judgment for that of the agency." 401 U.S. at 415–16, 91 S.Ct. at 823–824. In the absence of clearer guidance, courts have generally tailored the scope of review to the nature of the issues at stake, their susceptibility to articulation and demonstrable proof, the specificity of any special standards for review contained in the enabling legislation, the formality of the required administrative record, and the comparative competence of courts and agencies. The case law provides no surefire formula, and has led Judge Carl McGowan to note that "judicial review can, if so minded, find great latitude to range widely, no matter how the standard of review is articulated." 74 Col.L.Rev. 1015, 1022 (1974).

■ A starting point for analysis of the proper standard for review is an explanation of the type of findings and type of record which are typical to rule-making. The findings and record differ substantially from those required in formal adjudication under 5 U.S.C. §§ 556 and 557. The agency is not required to supply specific and detailed findings and conclusions, but need only "incorporate in the rules a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975). The agency need not discuss every item of fact or opinion included in the written comments submitted to it. The "basis and purpose" statement must, however, identify "what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968). In addition, the record in a rule-making proceeding "ordinarily will contain more generalized than specific information, may not contain information tested by cross-examination and will frequently contain much conclusory information based on data gathered by interested parties." *City of Chicago v. F. P. C.*, 147 U.S.App.D.C. 312, 458 F.2d 731, 744 (1971). The method of analyzing this material bears a closer resemblance to legislative than adjudicative functions. The agency is not testing new evidence against an established standard, but instead is fashioning a set of legal standards having prospective effect. The agency therefore "deals less

with 'evidentiary' disputes than with normative conflicts, projections from imperfect data, experiments and simulations, educated predictions differing assessments of possible risks, and the like." *Amoco Oil Co. v. E. P. A.*, 163 U.S.App.D.C. 162, 501 F.2d 722, 734–35 (1974). To arrive at a policy determination under this procedure the Secretary should consider evidence presented in the record, but he may also look beyond it and rely on his own expertise and experience and on other relevant material available to him. *Consumers Union v. Consumer Product Safety Comm'n*, 491 F.2d 810, 812 (2d Cir. 1974); *Angel v. Butz*, 487 F.2d 260, 262–63 (10th Cir. 1973); *General Telephone Co. of Southwest v. United States*, 449 F.2d 846, 862 (5th Cir. 1971). Where decisions turn on factual determinations which are readily capable of empirical analysis, however, a reliance on extra-record experience may be inherently implausible. *National Tire Dealers & Retreaders Ass'n, Inc. v. Brinegar*, 160 U.S.App.D.C. 238, 491 F.2d 31, 40–41 (1974).

In sum, there is not a simple formula which we can apply to avoid the process of judgment. Our essential task is to establish parameters of rationality within which the agency must operate. The most important parameter distinguishes between choices which are quasi-legislative policy judgments and those which are factual findings. Characterization as one or the other depends on the availability, reliability and scope of the relevant data, and on the size of the evaluative and predictive components in the decision-making process. The paramount inquiry is whether a reasoned conclusion from the record as a whole could support and explain the Secretary's course of action.

PMA raises two objections to the Secretary's findings: the sufficiency of the record to support findings that the MAC regulations will assure drug quality, and that drug costs in excess of MAC levels are "unnecessary in the efficient delivery of needed health services."

### 1. Drug quality

PMA's first contention is that the quality control procedures in the MAC scheme are based on the Secretary's false and unsupported assumption that the Food and Drug Administration's (FDA) regulatory control activities will assure the quality, therapeutic effectiveness and bioequivalence of MAC-listed drug products. According to the procedures set up by the MAC regulations, the Pharmaceutical Reimbursement Board relies on the FDA to identify drug quality problems prior to the establishment of a MAC and does not make its own independent finding on these issues.[30] Therefore FDA activities play a crucial role in the quality control process. PMA argues that the written comments submitted on the proposed MAC regulations contained persuasive evidence showing the inadequacy of FDA's quality control procedures and that the Secretary's basis and purpose statement and the administrative record failed to adequately respond to this evidence.

In general, the comments reveal that medical and pharmaceutical organizations differ widely with respect to their confidence in the ability of the FDA to assure overall drug quality. There are comments which support and those which oppose the Secretary's conclusions. One reason for the divergence of expert opinion on this issue stems from the technical complexity of the subject and undefinable nature of a "quality" criterion in drug manufacture. There seems to be no dispute that the drug industry can never achieve a "zero-defect" level; consequently, the controversy is over how much quality is enough.

The debate on the issue of drug quality centers on the problem of drug bioequivalence. Simply stated, the crucial question in the bioequivalence problem is to what extent can the chemically equivalent drug products of different manufacturers be interchanged without an unacceptable change in the therapeutic effect that will be pro-

---

**30.** See 40 Fed.Reg. 32298, ¶ 99. The role of the Board in drug quality determinations is more fully discussed in Part IV.B.2., III. D, pp. 1212–1213, *infra*.

duced. The issue of interchangeability is important in the context of the MAC regulations, because they provide that a physician who sees no medical necessity for prescribing more expensive drug products for his patient may rely on the fact that less expensive, chemically equivalent drug products will perform with full effectiveness.

To fully understand the bioequivalence problem, we must define certain terms. We quote the Senate testimony of Dr. Robert W. Berliner, who is the Dean of the Yale School of Medicine:

> Drug products are said to be chemically equivalent when they contain the same amount of the same *active* ingredient in the same dosage form. Drug products are said to be bioequivalent [or equally bioavailable] when their active ingredients are absorbed from the gastrointestinal tract at substantially the same rate and to the same extent as indicated by the time-course of their concentration in the blood. They are said to be therapeutic equivalents when they produce the same therapeutic effect with no difference in toxicity or side-effects.[31]

According to Dr. Berliner, chemically equivalent drug products made by different manufacturers may in some cases be bioinequivalent; that is, they may produce different concentrations of the active ingredient in the blood. However, two drugs may be bioinequivalent and yet still be therapeutically equivalent; that is the different active ingredient concentrations in the blood may both fall within the range between acceptable drug efficacy and unacceptable drug toxicity. Finally, "in a very few instances," differences in bioequivalency may lead to therapeutic failures (toxic effects).[32] Interchangeability problems arise in this last category of cases.

PMA's main argument is that the FDA's regulatory activities and monitoring programs are inadequate to assure the therapeutic equivalence and interchangeability of all MAC listed drugs. To support this argument, PMA relies primarily on two reports. The first is a report on drug bioequivalence which was conducted for the Congress by the Office of Technology Assessment (OTA report). In the OTA report, a panel of medical experts, headed by Dr. Berliner, examined the FDA's reliance on official drug compendia and its guidelines for Good Manufacturing Practice (GMP) and found that they did not ensure bioequivalence for drug products. The second report is an audit of the FDA's inspection program that was conducted by the General Accounting Office (GAO) in 1973. The GAO report concluded that the FDA, in carrying out its inspection program, had not always aggressively enforced drug producers' compliance with the GMP guidelines and that many firms had marketed adulterated drug products. Finally, PMA argues that the scope of FDA's drug surveillance program is too limited to compensate for these alleged inadequacies in the inspection program. PMA therefore concludes that the comments, which cited these reports, raised "substantial questions" concerning the ability of the FDA to assure the interchangeability and quality of MAC-listed drugs and that the MAC regulations were issued prematurely before adequate regulatory procedures were developed.

The second prong of PMA's argument is that these comments were neither adequately answered in the "basis and purpose" statement (the Preamble) of the MAC regulations nor sufficiently refuted by information in the administrative record. PMA further asserts that the Secretary's expressed reliance in the Preamble on *pro-*

---

**31.** *Hearings Before the Subcommittee on Monopoly of the Select Committee on Small Business of the U. S. Senate,* 94th Cong., 1st Sess., pt. 26, p. 11656 (1975) [hereinafter cited as Monopoly Committee Hearings]. These hearings were not in the administrative record but they echo similar testimony before a different Senate committee by Dr. Berliner. That testimony was placed in the record, 40 Fed.Reg.

32285. See *Hearings on the Examination of the Office of Technology Assessment Report of the Drug Bioequivalence Study Panel Before the Subcommittee on Health of the Senate Committee on Labor and Public Welfare,* 93d Cong., 2d Sess., 81–82 (1974) [hereinafter cited as OTA Report Hearings].

**32.** OTA Report Hearings at 82.

*posed* regulations to assure drug quality and bioequivalence constitutes an admission that existing procedures are inadequate, is an arbitrary "leap of faith" that future FDA action will be effective, and precludes effective public or judicial scrutiny of the basis for the regulations. PMA also characterizes other materials in the record as inadequate to support the Secretary's findings.

■ Our examination of the record persuades us, however, that the Secretary could reasonably conclude that (1) FDA programs, despite some inadequacies, are functioning well enough to assure drug quality, and (2) that bioinequivalence is neither a major problem nor an insurmountable obstacle to the MAC program.

■ Before detailing the administrative record which supports these conclusions, we emphasize that the issues of drug quality and bioequivalence are much more judgmental and less factual than PMA has sought to characterize them. Many underlying issues are on the frontiers of science [33] and present problems of great technical complexity, requiring analysis of extensive and often incomplete statistics, scientific reports and studies. "Interpretation of, and assignment of weight to, data such as these is a task which particularly calls for expert judgment." *City of Chicago v. F. P. C.*, 147 U.S.App.D.C. 312, 458 F.2d 731, 747 (1971). Moreover, when insufficient data are available to make a fully informed factual determination, decision-making must depend more on policy judgments than factual analysis. Such policy choices are not susceptible of easy verification or refutation by reference to the record. *Industrial Union Department, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 499 F.2d 467, 474–75 (1974). The Secretary must interpret data which are amenable to varying interpretations and then must make a considered assessment of relative medical risks and eco-

nomic benefits of his decision. In such circumstances, the Secretary's refusal to accept the recommendations of one scientific report or his limited explanation of why it was rejected is no indication that he acted arbitrarily. He need not respond to and refute each of the factual findings of the reports. The Secretary had an essentially legislative task to perform in evaluating the efficacy of the FDA's regulatory mechanisms.

Given this standard, we apply it to the administrative record. In the Preamble to the regulations the Secretary explicitly stated that he had studied the OTA report and concluded that its recommendations did not justify a delay in the implementation of the MAC program. This conclusion is supported by an examination of the testimony at the Congressional hearing on the OTA report.[34] That testimony established agreement even among four of the OTA panel experts that although present FDA programs were inadequate to solve all bioequivalence problems, those problems existed for only about 15% of the drugs on the market, and a large number of drugs could be put on an interchangeable list under the MAC program without any serious or urgent health problem.[35] According to one OTA panel member, 85% of the drugs could be prescribed safely despite a "very wide latitude" in the making of "all kinds of errors in quantity decisions, and still coming up with reasonable effects without toxicity."[36] Therefore it appears likely that most drugs will not have bioequivalence problems. The record also indicates that although the scope and extent of the bioequivalence problem is as yet not clearly defined, current medical technology is capable of discerning which drugs will exhibit such problems.[37] The MAC regulations rely on these facts and establish a procedure whereby MAC limits will be withheld or delayed if there is any FDA regulatory action, either pending or under considera-

---

**33.** Joseph Stetler, PMA's President, admitted this fact in his Congressional testimony. OTA Report Hearings at 133.

**34.** See OTA Report Hearings.

**35.** OTA Report Hearings at 85–90.

**36.** *Id.* at 85.

**37.** *Id.* at 83, 138, 164.

tion, to establish a bioequivalence standard for the proposed MAC-listed drug. 45 C.F.R. § 19.5(b). And if FDA review of the written public comments or the administrative record raises a doubt regarding the bioequivalence of a drug for which no standard has yet been set, the FDA may suspend the MAC process to establish the needed bioequivalence requirement.[38] These procedures represent a reasonable and careful response to the concerns in the OTA report on bioequivalence.

The OTA report also criticized FDA's compendia standards and GMP guidelines. Although the OTA report had emphasized the weakness of FDA's present compendial standards to detect these problems, Dr. Berliner, who headed the OTA panel, testified that the MAC program need not be delayed until the standards were improved.[39] In addition, representatives of the American Pharmaceutical Association strongly supported the adequacy of present compendial standards and took issue with the OTA panel's criticisms.[40] Finally, the Secretary weighed these criticisms and provided a full and reasoned exposition of the considerations he found persuasive in rejecting the necessity for new standards.[41]

The FDA's GMP guidelines were also attacked in the OTA report, but those criticisms were levelled primarily at the inability of the GMPs to assure uniform bioavailability, rather than general drug quality.[42] The Secretary's citation of the low number of recent FDA recalls and seizures of drug products reasonably led him to conclude that "by far the majority of the drugs on the market today do meet all legal requirements for quality." 40 Fed.Reg. 32285.

Finally, we see no unreasonable flaw in the Secretary's partial reliance on proposed FDA regulatory improvements to combat bioinequivalence, where significant bioequivalence problems are neither known nor anticipated. Although proposed regulations may be a form of non-record information, the Secretary's reliance on them does not preclude effective public or judicial scrutiny of the MAC regulations in violation of the Administrative Procedure Act, nor does it demonstrate the inadequacy of existing procedures. Instead, the pendency of proposed FDA regulatory improvements represents a permissible factor to be weighed by the Secretary in making his predictive judgment of the probable medical risks in the MAC program. This judgment need not and should not be confined to a purely retrospective examination of past drug program policies and experience. In any event, the Secretary also concluded that existing GMP guidelines could assure drug quality, although he indicated that drug quality is a relative concept which contemplates continuing improvements to reflect current scientific developments. 40 Fed.Reg. 32285. Therefore we find rational support for the Secretary's conclusions that doubts concerning the compendial standards and GMP guidelines are inadequate to justify a delay of the MAC program.

PMA's final criticism of the FDA is directed at the alleged inability of its drug monitoring activities to assure drug quality. To support this point PMA first cites a 1973 General Accounting Office (GAO) report that criticized FDA's factory inspection program.[43] We think the report has little probative value, however, because the underlying investigation was conducted between

---

**38.** Should the FDA advise the Board that in its judgment there is a reason for withholding or delaying the establishment of a MAC for a drug based on the issues raised in comments or hearing requests submitted on a proposed MAC determination, the Board will suspend further action on the proposal. Action to establish a MAC for that drug will not be taken by the Board until such time as it is advised by the Food and Drug Administration that there is no longer a reason for delaying or withholding the establishment of a MAC for the drug. 40 Fed.Reg. 32300, ¶ 111. See 45 C.F.R. § 19.5(b).

**39.** OTA Report Hearings at 86.

**40.** *Id.* at 181–84.

**41.** *Id.* at 127–28.

**42.** *Id.* at 122–23.

**43.** General Accounting Office, Report to the Congress: Problems in Obtaining and Enforcing Compliance with Good Manufacturing Practices for Drugs, B–164031(2), March 29, 1973.

1969 and 1971[44] and subsequent Congressional testimony of GAO officials supports the Secretary's conclusion[45] that the FDA had taken action to correct the deficiencies found by the GAO and had implemented the GAO recommendations.[46] PMA also complains that the FDA Drug Surveillance Program and its Defect Reporting System, which were cited by the Secretary in the Preamble as examples of adequate regulatory safeguards,[47] are of insufficient scope and intensity to compensate for the alleged weaknesses in FDA's inspection program. To support this allegation, PMA cites an inconclusive statement by the OTA Panel which implies that FDA sampling procedures, which test only a small percentage of drug products, are inadequate to detect defective batches.[48] We find no factual support for this assertion in the Report, or any indication that these statistical acceptance procedures have resulted in a measurable or noticeable decline in drug quality.

 We have considered other arguments raised by PMA which criticize FDA regulatory mechanisms, but fail to see how they undermine the rationality of the Secretary's conclusion that "the vast majority of drugs marketed in this country are of an acceptable quality for patient care." 40 Fed.Reg. 32285. We believe PMA has in several instances attempted to assert an overly broad scope of review of the Secretary's examination of these FDA mechanisms. PMA's briefs often suggest that the Secretary has the burden of proving, by substantial evidence and detailed factual citation, that each criticism of FDA activities is without merit. PMA also suggests that the test for acceptable drug regulation is whether drug products have achieved optimal and uniform quality. The Secretary's actions, however, must be scrutinized by more realistic and modest standards. The Secretary's conclusions on drug quality are legislative judgments on a series of complex, technical issues, based on a wide spectrum of administrative and scientific materials. The Secretary has clearly made a searching and thorough examination of these issues. (His statement of reasons covers some 18 pages in the Federal Register.) He was aware of each criticism raised in the comments and responded to them. He recognized that the compendial standards, GMP guidelines and inspection programs have deficiencies and can be improved. He also recognized, as we do, that drug quality is not an objective but a relative criterion, dependent on an analysis of existing technology and balanced by competing considerations concerning the fiscal integrity of the Medicare and Medicaid programs. He has concluded that despite some administrative difficulties, the FDA has been largely successful in assuring that all drug products are of adequate quality and purity to assure safety and effectiveness. And he has provided mechanisms in the MAC regulations to test this general conclusion in the context of each actual MAC proceeding. We find that the Secretary's approach is reasonable and supported by the record.

44. *Id.* at 23.

45. 40 Fed.Reg. 32285–86, ¶ 6.

46. *Monopoly Committee Hearings, supra,* 93d Cong., 2d Sess., pt. 24, at 9944–45 (1974). In 1974 the Chairman of the FDA estimated that companies producing 95% of all of the nation's prescription drugs are inspected at least once every two years, with 100% inspected every 2½ years. *Id.* at 9950–51. (The FDA is required by statute to inspect all plants once every two years.) Although these hearings were not made a part of the administrative record, the facts derived from them are general legislative facts which were used by the Secretary to make a broad policy judgment on the adequacy of FDA activities. In such an instance, the Secretary may look to extra-record facts to support his conclusion in the Preamble that the FDA "has taken steps to assure that drug firm inspections are scheduled and undertaken according to the [statutory] requirements" (40 Fed.Reg. 32286). Cf. *City of Chicago v. F. P. C.,* 147 U.S.App.D.C. 312, 458 F.2d 731, 745–48 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). In any event, they were cited in one of the written comments submitted in support of the proposed MAC regulations. See Comments of the Federal Trade Commission Staff, at p. 2. (Def. Exh. O.)

47. 40 Fed.Reg. 32285.

48. OTA Report Hearings at 34.

Accordingly, the defendant's motion for summary judgment on the issue of drug quality is granted; plaintiff-intervenor PMA's cross-motion for summary judgment is denied.

### 2. Unnecessary costs

 PMA also challenges the sufficiency of the administrative record to support the Secretary's finding that those portions of the cost of drugs exceeding MAC levels are unnecessary in the efficient delivery of needed health services.[49] Specifically, PMA asserts that the Secretary failed to consider whether the higher prices charged by some drug companies reflect indirect costs that contribute markedly to the efficient delivery of health care. PMA claims that these indirect costs result from the extensive research and development efforts, informational and distribution services, and superior recall capabilities of certain major pharmaceutical manufacturers.

This argument rests upon an untested assumption. PMA assumes that the cost of the collateral drug services it has identified will necessarily be costs over and above MAC limits and therefore not reimbursable. PMA has not demonstrated, however, that the major manufacturers who provide these services will not occasionally or regularly sell drugs at or below the MAC price. In such cases, the manufacturers would be fully reimbursed for the collateral services. In addition, the MAC mechanism does not intentionally or expressly exclude any cost component. Instead, it relies on price competition to establish a reasonable cost limit which presumably includes necessary costs. The lowest unit price will depend on prices established in the market place and may well include the indirect costs cited by PMA.

Given these qualifications, PMA's argument is reducible to the contention that the Secretary failed to consider whether a noncompetitive pricing scheme might more efficiently deliver health services because it assertedly would encourage major drug companies to continue their extensive research and distribution services. The Secretary need not, however, laboriously respond to each comment submitted; in particular, he need not address each comment in the precise terms in which it was raised. Rather, his responsibility is to identify major policy issues and explain the agency's resolution of them. *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968). The record here documents the Secretary's awareness of the complex of collateral services offered by the major drug manufacturers. Although we have located no explicit finding regarding each factor isolated by the PMA in their briefs, the record contains references supporting the Secretary's implied findings that the costs attributable to these incidental services are on the whole unnecessary. *E. g.*, Inflation Impact Statement at 5–7 (use of the lowest unit price standard would not significantly interfere with research and development); Preamble, 40 Fed.Reg. at 32285 (additional costs for drug quality control are unnecessary; recalls described as "relatively insignificant" problem).

The record thus suggests a reasoned basis for the Secretary's implicit conclusion that the costs of the specific incidental services cited by PMA are unnecessary. Concomitantly, these and other references in the record suggest a reasonable basis for the Secretary's decision to rely upon price competition to determine whether any and all given costs are unnecessary. Accordingly, the plaintiff-intervenor PMA's motion for summary judgment on the issue of unnecessary costs is denied; defendant's cross-motion for summary judgment is granted.

### D. *Fairness of MAC Procedures*

PMA's next major argument attacks the fairness and legality of the procedures the regulations outline for determining individual MAC limitations. PMA contends that

---

**49.** Determinations of unnecessary costs are required by 42 U.S.C. § 1395x(v)(1)(A), and the Secretary made a general finding to this effect in the Preamble. 40 Fed.Reg. 32288–89, ¶¶ 18, 29.

the regulations unlawfully allocate unfettered discretion to the FDA to make critical determinations of drug quality and therapeutic equivalence without an opportunity for participation by affected parties, and without an explanation by the FDA of its decision. PMA claims that these deficiencies constitute violations of § 4(c) of the Administrative Procedure Act, 5 U.S.C. § 553(c). We note initially that PMA's attack does not focus on procedural irregularities in the promulgation of the MAC regulations themselves. PMA had an opportunity to participate in that rule-making procedure. Rather, PMA challenges the procedures established by the MAC regulations. Therefore, our inquiry focuses on the validity of an agency's selection of procedural processes within the framework of a properly adopted rule.

Under the regulations, threshold questions of bioequivalence and drug quality are referred to the FDA by the Pharmaceutical Reimbursement Board, 45 C.F.R. § 19.5(b). The FDA is to advise the Board in writing of any pending or anticipated regulatory activity which would warrant delay in establishing MAC limits for particular multiple-source drugs. If the FDA advises the Board of agency activity warranting a delay in the process of proposing a MAC limit, the Board may not proceed. As a result, the FDA may halt the Board's attempts to set a MAC limit for any particular multiple-source drug. As we understand PMA's motion, they do not challenge the FDA's decision-making power if this is the outcome.[50]

PMA does challenge, however, the procedural safeguards attending the second possible outcome of FDA investigation, which is that the FDA finds no reason for the Board to postpone the MAC process. In this event, the Board determines the lowest unit price of the drug and submits its finding to the Pharmaceutical Reimbursement Committee. *Id.* § 19.5(c), (d). After receipt of the Committee's advice, the Board determines whether the lowest unit price as previously determined should be proposed as the MAC limit. *Id.* (d). The Board then publishes notice of the proposed MAC, receives public comments, and holds informal hearings if they are deemed necessary. *Id.* (f), (g), (h). On the basis of the comments and hearings, the Board makes a final determination of the MAC limit, and publishes notice and an explanation of its decision. *Id.* (i). Consequently, in the event of a "green light" response from the FDA, the regulations provide for public participation in the decision-making process.

PMA's complaint is that the opportunity for comment comes too late to be meaningful. This contention rests upon PMA's interpretation of the roles played by the Board and the FDA in ascertaining the existence of drug quality and bioequivalence problems. As PMA reads the MAC regulations, the determination of potential problems in these areas is committed exclusively to the FDA. Because the FDA is not obligated to receive public comments, to explain its decision to give the "go ahead" signal, or to follow an articulated standard, the key questions of quality and bioequivalence are withdrawn from public participation. PMA discounts the efficacy of the procedural safeguards attending the Board's subsequent deliberations, because, in PMA's estimation, the Board's inquiry is limited to economic considerations.

To support its position, PMA refers to the Preamble's allocation of Board and FDA responsibility. According to ¶ 111, "The Board does not make independent determinations, at any stage during the MAC determination process relating to issues of drug quality, safety, bioavailability, or other matters pertaining to Food and Drug Administration regulatory control." And if public comment raises such issues, "it is

---

**50.** Indeed, at this time, the Board is merely suggesting the development of a proposed MAC, and the FDA's response is in the nature of an inter-agency comment upon the feasibility of the suggested proposal. PMA offers no authority to support its demand for public participation at so early a stage in the informal rule-making process, and we decline to require it. Moreover, the Board's referral to the FDA is appropriate given its responsibility for monitoring the nation's drugs.

intended that the Board will seek the advice" of the FDA. *Id.* In addition, PMA claims that the plain language of the regulations buttresses its conclusion that the Board is bound by the FDA's evaluations of quality and equivalence, and that the Board's role is limited to economic considerations. Unless the FDA notifies the Board of a reason to delay, the regulations provide that the Board "shall" proceed to determine the lowest unit price of the drug. § 19.5(c).

We believe PMA errs when it concludes from a consideration of these isolated provisions that the issues of quality and therapeutic equivalence are committed exclusively to the FDA. When the Preamble and the MAC regulations are read as a coherent whole, a different assignment of the decision-making function is revealed.

We agree with PMA that the Board's predominant concern is with the economic aspects of establishing a MAC. Briefly, the major components of the Board's task are four: to identify multiple-source drugs which are sold at significantly different prices and for which significant amounts of federal funds are spent, to determine the lowest unit price of these identified drugs, to propose MACs for these drugs, and to decide whether the proposed MACs should be adopted as final. Thus the Board's primary goal is to determine the lowest unit price and establish a MAC at that level. In contrast, questions of quality and bioequivalence are primarily committed to the FDA. Two facts indicate that the MAC scheme contemplates this division of labor. First, threshold questions of quality and bioequivalence are referred to the FDA. *Id.* § 19.5(b). Second, if public comment raises these types of questions, the Board refers them to the FDA. That the Secretary foresees such referral is explicitly evident from the Preamble's statement that these comments will be referred to the FDA, and implicitly evident from the Preamble's statement that the Board makes no independent determinations on these issues (¶ 111). Thus, we are confident that the regulations anticipate the allocation of major areas of responsibility along these lines.

We must, however, distinguish between a working division of labor and an exclusive decision-making authority. Initially, it is clear that the FDA may unilaterally prevent the Board from proposing a MAC for a given drug by notifying the Board of regulatory action which merits delay. The authority to make this threshold decision is vested in the FDA alone. § 19.5(b). Importantly, however, the FDA's power to dictate to the Board is negative in scope. The FDA can abort the MAC process, but it does not appear that its finding that there is no reason to delay compels the Board to either propose or finalize a MAC. Admittedly, there is some indication that the FDA's initial finding forces the Board to take, at least, the next step in the MAC process, which is to determine the lowest unit price. The relevant language in the regulations is mandatory in nature: "For each drug . . . for which the [FDA] has not advised delaying or withholding the establishment of a MAC, the Board shall determine the lowest unit price . . . ." *Id.* § 19.5(c). From this language the PMA concludes that after the FDA gives its tacit approval, the Board's discretion extends only to the level of the resulting MAC, and that the Board could not refuse to propose any MAC. Subsequent sections, however, indicate that the Board is invested with the authority not only to decide the level of a proposed MAC, but also to decide whether to propose any MAC at all. *Id.* § 19.5(e), (g), (i). These sections give the Board ample authority to decline to propose a MAC on the grounds that the drug's quality or bioequivalence is questionable. The most logical reconciliation of the language in these sections with the language in § 19.-5(c), is that the Board must follow the orderly procedures set out in the MAC regulations (if the FDA finds no reason to delay), but the substance of their ultimate decision is charged to its discretion.

PMA argues, however, that even if the Board has the authority to "overrule" the FDA by withdrawing a drug from the MAC

process, it lacks sufficient expertise to do so. On this issue, the composition and role of the Pharmaceutical Reimbursement Committee, and the timing of its review, are relevant. The Preamble contemplates that the Committee members will be drawn from the areas of pharmacy, pharmacology, medicine, pharmaceutical marketing, public health, and consumer affairs. ¶ 82. These experts advise the Board on two matters: "the Board's determinations of lowest unit price and the appropriateness of proposing a maximum allowable cost" for an identified drug. § 19.5(d). Predictably, some of the Committee's comments on the Board's determination of lowest unit price will be economic in nature. But the Committee is also charged with the rather general responsibility of commenting on the appropriateness of proposing a MAC for a drug. Given the varied backgrounds of the Committee members, we would expect them to address the questions of drug safety, quality, and bioequivalence, if they suspect problems in these areas, especially since nothing in the regulations or Preamble limits the Committee's investigation to economic aspects of a MAC. Moreover, the Committee presents its advice directly to the Board, and not the FDA, and the Committee's review follows the FDA's assessment of a drug. There would be no need for expert input after FDA review if the Board were confined to reviewing economic issues. Finally, the language of the regulations indicates that the Board may decide against proposing a MAC on the basis of the Committee's report. Upon ·receiving the Committee's recommendations, the Board is to determine "whether the lowest unit price should be proposed" as the MAC. § 19.5(e). And if it decides in the affirmative, the proposed MAC is published in the Federal Register affording the public an opportunity to respond with written comments or a request for an informal hearing. Thus, al-

though no medical or pharmaceutical experts sit on the Board, the expert input from the Committee and the potential of it from the public enables the Board to make reasoned decisions on noneconomic questions after FDA review.[51]

Thus, reading the Preamble and the regulations as an integrated scheme, the Board's primary concern is with the economics of setting a MAC, although by virtue of its authority to decide whether or not to propose or finalize a MAC, it has ultimate decision-making responsibility for noneconomic questions as well. But because the Board lacks expertise in these areas, it is not independently charged with investigating these matters. Instead, the regulatory scheme mandates that the Board refer its determinations out to groups of experts for advice and recommendations. Early in the process the FDA is given the opportunity to save the Board from expending unnecessary time developing a MAC for a drug which presents quality or bioequivalence problems. If the FDA isolates no specific problems, the Board continues the MAC process by finding the lowest unit price. Then, the experts on the Committee have a chance to again focus the Board's attention on noneconomic issues. Finally, the time for public comment provides the Board with a last opportunity to evaluate these questions.

In light of this scheme, the Preamble's statement that the Board makes no independent determinations of quality and bioequivalence becomes clear. If public comment raises these issues the Board would be expected to refer them to the FDA, which has the expertise to investigate these matters. But even if the FDA once again finds no reason to delay, nothing in the regulations obliges the Board to finalize a proposed MAC if public comment causes it to hesitate. Nowhere is the Board mandated to ignore or discount information simply

---

51. The Committee's input may also force the Board to face complex scientific questions of drug quality. When the Board publishes notice of a proposed MAC, it must also publish the Committee's report and a summary of its own reasons for proposing the MAC. 45 C.F.R.

§ 19.5(f). This requirement should provoke the Board to address and resolve questions of drug quality and bioequivalence, for this procedure ensures that any doubts entertained by the Committee will be exposed to public scrutiny.

because a source other than the FDA raises the issue. In the absence of an unmistakable directive to this effect, we decline to read one into the regulations.

The regulations allow PMA and other interested parties to raise quality and bioequivalence issues during the time allotted for public comment on the proposed MAC. Consistent with the regulations, the Board may act upon these comments by altering the level of the MAC or by withdrawing the proposed MAC entirely. *Id.* § 19.5(i). Consequently, PMA's contention that the regulations preclude meaningful comment on these critical issues is reduced to the argument that the time for comment should come earlier. As long as the regulations permit meaningful comment we see no reason to disturb the agency's timing of it.[52]

Accordingly, defendant's motion for summary judgment on the fairness of the MAC regulations' opportunity for comment is granted; plaintiff-intervenor PMA's cross-motion for summary judgment is denied.

### E. *Compliance With Executive Order No. 11821*

PMA also urges us to set aside the MAC regulations because HEW's Inflation Impact Statement fails to meet the requirements of Executive Order No. 11821 and its implementing document, OMB Circular A–107. The Administrative Procedure Act directs the reviewing court to set aside agency action taken without observance of the procedures required by law. 5 U.S.C. § 706(2)(D). Consequently, if the Executive Order and the Circular have the force and

the effect of law, we should grant the relief PMA seeks.

When issued pursuant to a statutory mandate or delegation of authority from Congress, presidential proclamations and orders have the effect of law. *See, e. g., Gnotta v. United States,* 415 F.2d 1271, 1275 (8th Cir. 1969). At least one other court has searched for statutory authorization for this executive order, and found it wanting. *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228 (8th Cir. 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). The plaintiffs here, as there, contend that § 3(a) of the Council on Wage and Price Stability Act, 12 U.S.C. § 1904 note, which directs the Council to review the activities of federal agencies to determine whether they contribute to inflation, provides the necessary statutory authorization. Even the most liberal construction of the provisions of § 1904 note reveals nothing which either expressly or impliedly authorizes the President to require federal agencies to report to him or the Council. *Cf. Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 586, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

We therefore agree with the conclusion of the Eighth Circuit that the Executive Order was intended to aid the President in implementing his personal economic policies and did not have the force and effect of law. Defendant's motion for summary judgment on the issue of compliance with Executive Order No. 11821 and OMB Circular A–107 is granted; plaintiff-intervenor PMA's cross-motion for summary judgment is denied.

---

**52.** As noted, HEW has begun the process of establishing the first MAC, to be applied to the antibiotic ampicillin trihydrate. In a submission dated December 14, 1976, the defendant reported on the status of those MAC proceedings. A review of the submitted materials shows that as HEW has operationalized the MAC regulations, the interested public has a substantial opportunity to participate in the early stages of the MAC process, long before the official time for public comment required by 45 C.F.R. § 19.5(f), (g). Meetings of the Pharmaceutical Reimbursement Advisory Committee have been opened for public participa-

tion. December 14 Submission, Exh. B, E. In particular, public comment was received at the Committee's meeting pursuant to § 19.5(d) to review the Board's determination of the lowest unit price and to give the Committee's advice and recommendation. *Id.* Exh. E. We emphasize that our decision that the regulations allow meaningful comment is not grounded upon these instances of early participation, but upon the opportunities provided by the MAC regulations as published. We refer to the December 14 submission in the context of our conclusion that the scheduling of the comment is best left to the agency.

## V. PROPRIETY OF SUMMARY JUDGMENT

Both AMA and PMA urge us, in the event that we deny their motions, to deny the government's cross-motion for summary judgment. AMA argues that partial summary judgment would be improper for such a complicated case. PMA contends that we must deny the government's motion where it relies upon materials outside the administrative record in attempting to find a reasonable basis for the Secretary's action. With each issue that we addressed in this lengthy memorandum decision, we necessarily have been cognizant of the appropriateness of a grant or denial of the defendant's cross-motions on that question. Separate consideration of the plaintiffs' arguments would be duplicative and unwarranted.

Having addressed and decided all of the issues raised by the complaints of plaintiffs and intervenors in favor of defendant, judgment will enter in favor of defendant dismissing the action.