**AMERICAN SOCIETY OF CATARACT AND REFRACTIVE SURGERY, et al., Plaintiffs,**

v.

**Louis W. SULLIVAN, M.D., et al., Defendants.**

**Civ. A. No. 91–1572 SS.**

United States District Court, District of Columbia.

Aug. 26, 1991.

---

Jerald A. Jacobs, Anthony Epstein, Jenner & Block, Washington, D.C., for plaintiff.

Tracy Merritt, Dept. of Justice, Civ. Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff American Society of Cataract and Refractive Surgery ("ASCRS") is a professional society of ophthalmologists who perform cataract surgery. Plaintiff Arthur Donaldson, M.D., is a Board-certified ophthalmologist with extensive experience in cataract surgery. Defendant Louis Sullivan is Secretary of the United States Department of Health and Human Services

("HHS"). Defendant Gail Wilensky is Administrator of the Health Care Financing Administration ("HCFA"), which is the division of HHS responsible for administering the Medicare program.

Plaintiffs initiated this suit seeking to enjoin implementation of a rule promulgated by HCFA that restricts Medicare coverage of certain kinds of cataract surgery. On August 5, 1991, the Court held a hearing on plaintiffs' motion for a preliminary injunction and on defendants' motion to dismiss. At that hearing, the parties stipulated that no material issue of fact is in dispute, and they requested that the Court consider their respective motions as cross-motions for summary judgment. Since the hearing, the parties have supplemented the record with additional affidavits and exhibits, including the certified administrative record of the rulemaking. Because the rule lacks a rational basis, and because it is inconsistent with requirements established by Congress, judgment will be entered for the plaintiffs and implementation of the rule will be permanently enjoined.

*I. Background*

A cataract is a vision-impairing clouding of the eye's lens. Cataracts typically occur as a normal accompaniment of the aging process. Since 1949, physicians have treated cataracts by removing the clouded natural lens and replacing it with an artificial substitute, a clear plastic device known as an intraocular lens, or IOL. IOL implantation is now a standard medical procedure, and approximately 1.25 million people receive IOLs each year.

Because most cataract patients are elderly, about 80% of IOL implants in the U.S. are paid for by the Medicare program. Medicare provides medical insurance for persons who are 65 years of age or older, or who are disabled. Medicare coverage of IOLs began in 1976. At that time, such coverage was an anomaly, because IOLs had not been approved for widespread use by the Food and Drug Administration (the "FDA"). HCFA ordinarily extends Medicare coverage only to devices and procedures that have been demonstrated to be safe and effective. Where applicable, it is HCFA's practice to rely on FDA approval processes in making determinations of safety and efficacy. If a device is subject to FDA regulation, and has not been approved for general use, HCFA considers the device to be "investigational" and therefore ineligible for Medicare coverage.

In 1976, IOLs had not yet received FDA approval for general use, although they were under study by the FDA. Motivated by the prevailing acceptance of IOLs by the medical community, however, and by the tremendous utility and safety of these devices, Congress in the Medical Device Amendments of 1976 (the "MDA") directed HHS to make IOLs "reasonably available." 21 U.S.C. § 360j($l$)(3)(D)(iii). In response to the MDA, and in light of the popularity of IOLs among both physicians and patients, HCFA revised Medicare policy to permit coverage of investigational IOLs, provided that the physicians implanting the IOLs met FDA standards for use of investigational devices.

Under this policy, use of IOLs expanded rapidly, and medical suppliers developed ever more sophisticated and effective IOL devices. To date, the FDA has approved approximately 900 IOL models for general use. Many more models, now considered investigational, await full FDA approval.

In May 1990, HCFA proposed to change its longstanding policy concerning IOLs. 55 Fed.Reg 21250 (May 23, 1990). It published for review a proposed rule that would provide Medicare coverage only to devices with full FDA approval. Investigational IOLs, although often the most up-to-date, would no longer be covered. The comments HCFA received from the medical profession and the general public were unanimously negative. Ignoring completely these comments, in April 1991 HCFA adopted the proposed rule as a final rule, effective May 30, 1991. 56 Fed.Reg 19874 (April 30, 1991). Plaintiffs now seek to prevent implementation of this rule and to keep in place existing HCFA policy.

## II. Threshold Jurisdictional Issues

Defendants have raised two jurisdictional challenges to plaintiffs' claim. Defendants contend both that plaintiffs lack standing to challenge the rule, and that they have failed to exhaust their administrative remedies. Both contentions must be rejected.

### A. Standing

■ This Court's jurisdiction is founded on the Administrative Procedure Act, 5 U.S.C. §§ 551–706 (the "APA"). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* at § 702. To establish standing to challenge an agency decision under the APA, a plaintiff must demonstrate that "the challenged action has caused him [or will cause him] injury in fact, economic or otherwise." *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Although the injury cannot be merely ideological, *see United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), it need not be an outright deprivation of property or liberty. *See Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (users of a national park have standing to challenge an agency's decision to permit development of the park).

■ Both ASCRS and Dr. Donaldson have demonstrated the requisite injury in fact. Dr. Donaldson's medical practice would be affected by the challenged rule, and ASCRS has standing on behalf of its members, whose practices will be similarly affected. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (organizations have standing to challenge actions injurious to members). The rule would limit physicians' ability to prescribe for their patients the best available course of treatment. In cases where an investigational IOL is, in the professional judgment of a treating physician, the preferred device, economics would nonetheless dictate use of an inferior IOL. Patients would be able to obtain state-of-the-art treatment only if they are able and willing to pay for the new device themselves.

In an analogous case, *American Medical Association v. Mathews,* 429 F.Supp. 1179 (N.D.Ill.1977), the United States District Court for the Northern District of Illinois held that plaintiff physicians had standing to challenge a decision not to provide Medicare reimbursement for certain types of prescription medication. The Court in *American Medical Association* found that the defendant, through its reimbursement policy, exercised " 'supervision or control' over plaintiffs' medical practice by effectively requiring them to prescribe only [approved] drugs," thereby inflicting "a distinctive and recognizable harm to an intangible interest." *Id.* at 1189, 1191. Similarly, plaintiffs in this case will be hampered in their exercise of professional judgment as to how best to treat their cataract patients. This injury in fact confers on plaintiffs standing to challenge the HCFA rule.

### B. Exhaustion

■ Defendants also contend that judicial review of the rule is barred by plaintiffs' failure to exhaust available administrative remedies. The Medicare statute provides a procedure for individual Medicare claimants to contest HCFA's reimbursement determinations. It is defendants' position that Medicare policies can be challenged only through these procedures.

This position is unsustainable. Defendants rely primarily on language in the Medicare statute which, they argue, makes the administrative review of individual reimbursement disputes the exclusive avenue for challenges to HCFA's Medicare rules:

> No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1311 or 1346 of

Title 28 to recover on any claim arising under this chapter.

42 U.S.C. § 405(h). By its own terms, however, this provision applies only to "claim[s] arising under" the Medicare statute—that is, to disputes between HCFA and individual beneficiaries over the amount of reimbursement to which a particular patient or provider is entitled in a specific case. The provision has nothing to do with challenges, such as the one in this case, to HCFA rules governing reimbursement policies.

There is no evidence at all that Congress intended to limit judicial review of HCFA rulemaking. In fact, the limitation urged by defendants would undermine the rulemaking process envisioned by the APA, of which judicial review is an integral component. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (APA mandates judicial review of rulemaking unless statutory prohibition on review or clear indication that Congress intended to commit decision solely to discretion of agency). The administrative review procedures established by the Medicare statute are designed to review questions of fact in particular cases, not to examine the legality of a broadly-applicable HCFA rule. The issues raised by plaintiffs in this case are primarily legal. To the extent there are factual issues, these involve facts about the IOL industry and the state of medical knowledge and practice that are applicable to all aspects of cataract treatment and surgery. Plaintiffs' claims are certainly not dependent on the facts of any particular patient's case. Nothing would be gained by forcing challenges to rules through the narrow and inappropriate channel of a claims dispute resolution procedure.[1]

▮▮▮ The plaintiffs have already exhausted the administrative review process appropriate to the type of challenge they seek to make. Eight individuals and enti-

ties, including Dr. Donaldson, submitted comments in response to HCFA's publication of the proposed rule. Every one of these comments urged HCFA not to proceed with the proposal. HCFA has already had the opportunity to consider the arguments against the rule, and it has chosen to promulgate the rule despite the objections. The HCFA rule is plainly "final agency action" within the meaning of the APA, 5 U.S.C. § 704, and is therefore subject to judicial review. The purpose of requiring plaintiffs to exhaust their administrative remedies is to enable a thorough agency evaluation of disputed issues and to avoid premature judicial interference. This purpose would not be served at all by withholding access to the courts from the plaintiffs in this case.

Prior cases have consistently rejected the argument urged by defendants. In *National Kidney Patients Association v. Sullivan*, No. 88–3251, 1988 WL 235539 (D.D.C. Dec. 22, 1988), *vacated as moot*, 896 F.2d 599 (D.C.Cir.1990); *see also National Kidney Patients Association v. Sullivan*, 754 F.Supp. 900 (D.D.C.1991), on facts virtually identical to those of this case, this Court held that the plaintiffs, health care providers and patients, could challenge a HCFA reimbursement policy without first being required to go through the administrative procedure for handling individual claims.

The Supreme Court addressed a similar issue in *McNary v. Haitian Refugee Center, Inc.*, —— U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). The plaintiffs in *McNary* were a class of illegal aliens seeking amnesty under recent amendments to the federal immigration statute. They sought to contest the interpretation given to the amendments by the Immigration and Naturalization Service (INS). The INS took the position that the plaintiffs' challenge could be heard only through the administrative review of individual claims for amnesty. The Supreme Court rejected the

---

1. Indeed, much might be lost, for patients would be reluctant to challenge HCFA reimbursement rules if doing so required them to risk bearing the cost of treatment themselves. Few patients would deliberately choose a medi-cal procedure not covered by Medicare on the slim possibility that a challenge to the HCFA rule denying coverage might eventually succeed in the courts.

INS's arguments, holding that "if not allowed to pursue their claims in the District Court, respondents would not as a practical matter be able to obtain meaningful judicial review of their application denials or of their objections to INS procedures." *Id.* at 898. It is clear from *McNary*, from the Medicare statute, and from the strong public interest in ensuring the reviewability of administrative rulemaking that the plaintiffs' failure to go through an individualized reimbursement procedure is no bar to the exercise of federal court jurisdiction in this case.

### III. The Legality of the HCFA Rule

Under the APA, the "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Plaintiffs contend that the HCFA rule violates the APA both because it lacks a rational basis and because it is contrary to Congress' intention as expressed in the Medical Device Amendments of 1976.

### A. The Basis of the HCFA Rule

■ The APA imposes on an agency the requirement that when promulgating a rule it must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). This requirement is particularly stringent when the agency is changing a long-established policy or practice: "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm,* 463 U.S. at 42, 103 S.Ct. at 2866.

■ In this case, HCFA has failed utterly to articulate a rational basis for its rule change. The policy initiated in 1976 of extending Medicare coverage to investigational IOLs has performed exactly as Congress intended it to perform. Millions of patients have received state-of-the-art medical treatment. The pace of technological and medical innovation by IOL manufacturers has been rapid. Since 1976, over 900 different IOL models have been approved for general use by the FDA.

HCFA now seeks to repudiate the policy responsible for this extraordinary record of progress. The new rule adopted by HCFA would afford Medicare reimbursement for IOL implants only to those patients and physicians who use IOL models that have been approved for general use. Investigational IOLs would not be covered. HCFA's stated reason for this change is that it wishes to conform its treatment of IOLs to the HCFA policy regarding other investigational devices, which ordinarily are not covered by Medicare. HCFA argues that the IOL exception is no longer necessary now that a large number of IOL models have been approved by the FDA for general use.

This argument ignores the fact that many cataract patients will suffer from the denial of access to investigational IOLs. HCFA acknowledges that many of the state-of-the-art IOL models are at present investigational. For example, HCFA received a comment on its proposed rule from Allergan, Inc., a manufacturer of IOLs. Allergan is currently producing an IOL that significantly speeds up patients' postoperative recovery and carries a reduced risk of infection. This IOL is classified as investigational, and would not be covered by Medicare under HCFA's new rule.

HCFA's position is short-sighted. The tremendous advances of the past 15 years were in large part made possible by the policy put in place in 1976. Without this policy, companies like Allergan would probably not be able to continue to produce improved IOLs. New medical devices do not go directly from research labs to the general market. They inevitably go through a period of investigational status,

during which their advantages and drawbacks are carefully monitored. Manufacturers and physicians working to develop IOLs need to be assured that they will be reimbursed for their efforts during these investigational periods. Withdrawing Medicare coverage will effectively deprive innovators of access to needed funding for their work. With only the mice population left as potential customers, there is every reason to expect that the IOL industry's remarkable level of invention will decrease dramatically, if not disappear entirely.

In contrast to the enormous, proven benefits of the existing IOL policy, HCFA has put forth absolutely no legitimate justification for the change. The new policy will not reduce government expenditures at all. HCFA concedes that if the new rule is permitted to stand, physicians who otherwise would use investigational IOLs will substitute Medicare-approved devices. The cost to the federal government would be the same. Indeed, the new policy may well prove costly in the long run, as the scientific community ceases to develop IOLs that are easier to implant and that reduce the amount of post-implant treatment—treatment that Medicare pays for.

Nor does HCFA contend that restricting Medicare coverage to IOLs approved by the FDA for general use will protect patients from unsafe devices. Investigational IOLs are thoroughly reviewed by the FDA for safety. They may be administered only by physicians meeting stringent FDA standards. Again, any impact the HCFA proposal would have on patient well-being would be negative, because it would replace a physician's judgment as to the medically appropriate IOL with the decision of a HCFA bureaucrat.

The sole rationale suggested by defendants for the change is HCFA's general policy against reimbursing Medicare patients for treatment with investigational devices. HCFA has made no effort to determine whether this policy is sensibly applied to IOLs. It has presented no evidence that the change will benefit patients, physicians, the government, IOL manufacturers, or any other conceivable constituent of the Medicare program. Instead of the careful investigation required by the APA of rulemaking agencies, HCFA has taken a sledgehammer approach, mechanically applying a broad policy—a policy which is itself of indeterminate origin and for which HCFA offers no justification based on evidence or research—without regard for the particular merits of the program under review.

HCFA is attempting to do here precisely what the Supreme Court forbade agencies to do in *Industrial Union Department, AFL–CIO v. American Petroleum Institute*, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980). In that case, the Department of Labor had issued a regulation requiring employers to protect their employees from exposure to benzene to the maximum technologically feasible extent. This regulation was the product of findings that exposure to high concentrations of benzene can cause cancer, along with a Labor Department policy that carcinogens in the workplace must be limited to the lowest possible levels. Benzene manufacturers challenged the policy, arguing that imposing a requirement of lowest possible exposure, rather than merely low exposure, would be very costly and would provide little or no additional protection to workers.

The Supreme Court invalidated the regulation. It found that the Labor Department, rather than making specific findings as to the need for benzene limits, had simply applied its blanket policy against carcinogens. The Supreme Court found that the Department had abdicated its statutory duties by failing to compile a factual record justifying its regulation:

In this case the record makes it perfectly clear that the Secretary relied squarely on a special policy for carcinogens that imposed the burden on industry or proving the existence of a safe level of exposure, thereby avoiding the Secretary's threshold responsibility of establishing the need for more stringent standards. In so interpreting his statutory authority, the Secretary exceeded his power.

*Id.* at 659, 100 S.Ct. at 2872. Similarly, in this case HCFA has exceeded its power

under the APA by regulating on the basis of bureaucratic whim rather than solid evidence.

In promulgating its new rule, HCFA took a program that plainly was not broke—and decided to break it. The spectacular success of this Medicare program in generating advances in medical technology apparently counted for nothing beside the agency's desire for superficial consistency among its various reimbursement policies. HCFA's stultifying regulatory strategy, with its preference for government rules over market-generated innovation, is reminiscent of the central planning apparatuses that other nations are now struggling to leave behind.

When pressed at oral argument to explain HCFA's rationale for the proposed change, counsel for the defendants stated that HCFA believes that the 900 IOL models presently approved for general use provide physicians with all the options they need to treat cataracts. If this type of thinking were to prevail, the status quo would be frozen and research and development would become a thing of the past. That is not the American way. This Court simply cannot understand why HCFA wants to stifle the kind of program that will keep this nation as the leading proponent of private sector innovation.

### B. The Medical Device Amendments of 1976

In the Medical Device Amendments of 1976 (the "MDA"), 21 U.S.C. §§ 360c–360*l*, Congress amended the Food, Drug, and Cosmetics Act to provide for FDA regulation of non-drug medical devices that are worn by, applied to, or implanted in patients. The statute directed the FDA to classify medical devices according to their safety and effectiveness. Although devices in Class I and Class II are subject to performance standards established by the FDA, they can be sold without pre-market FDA approval. Devices in Class III are investigational devices. They can be used only with the pre-market approval of the FDA, and even then only under conditions and by physicians meeting FDA requirements.

The MDA contained transition provisions to deal with devices already in use at the time of the statute's enactment. Except for those devices which the FDA had previously regulated and approved as "drugs," all existing devices, like all new devices, were automatically classified as Class III devices, subject to later reclassification. Under these provisions, IOLs would have fallen into Class III. Although they were widely used by physicians in 1976, IOLs had never been approved by the FDA.

Because Congress wanted IOLs to be available to the general public, it included in the MDA a special provision relating solely to IOLs. This provision directed that if IOLs were deemed to be investigational devices under the statute, the "requirements ... [pertaining to] the investigational use of such a device ... shall be made applicable in such a manner that the device shall be made reasonably available to physicians meeting appropriate qualifications prescribed by the Secretary [of HHS]." 21 U.S.C. § 360j(*l*)(3)(D)(iii); *see also* House Conference Report No. 94–1090, 94th Cong., 2d Sess. 63 (1976) ("provision applies solely to the intraocular lens"), *reprinted in* 1976 U.S.Code Cong. & Admin.News 1103, 1115. This directive was addressed to HHS, which includes both the FDA and HCFA. The FDA responded by issuing regulations designed to ensure that qualified physicians would be able to prescribe and implant IOLs. HCFA responded by implementing the Medicare reimbursement policy it now seeks to rescind.

The MDA evidences a clear congressional intent to assure patients access to the most advanced IOL devices. It demonstrates Congress' understanding that full FDA approval of IOLs often lags behind their acceptance by the medical community. By enacting the IOL provision of the MDA, Congress sought to provide cataract sufferers the benefits of the most up-to-date IOL research. HCFA discharged its statutory mandate in 1976 when it extended Medicare coverage to investigational IOLs. It now

ignores this mandate by withdrawing such coverage.

Because the challenged regulation lacks a rational and articulable basis, and because it violates the intent of the MDA, HCFA's action in adopting the regulation was arbitrary, capricious, and contrary to law. Plaintiffs' motion for summary judgment will be granted, and implementation of the regulation will be enjoined.